## LITTON INDUSTRIES, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2112-79.        Filed December 3, 1987.

*Deane E. McCormick, Jr., Dennis P. Bedell,* and *Melissa Thomas May,* for the petitioner.

*Elaine T. Fuller* and *Marion L. Westen,* for the respondent.

---

## FINDINGS OF FACT AND OPINION

CLAPP, *Judge:* Respondent determined a deficiency in petitioner's Federal corporate income tax for the year ended July 29, 1973, in the amount of $11,583,054. After concessions, the issue for decision is whether Litton Industries received a $30 million dividend from Stouffer Corp., its wholly owned subsidiary, or whether that sum represented proceeds from the sale of Stouffer stock to Nestle Corp.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the attached exhibits are incorporated by this reference.

Litton Industries, Inc. (petitioner), and its subsidiaries manufactured and sold, inter alia, business systems and equipment, defense and marine systems, industrial systems and equipment, and microwave cooking equipment. It maintained its principal office in Beverly Hills, California, at the time it filed its petition in this case.

On October 4, 1967, petitioner acquired all the outstanding stock of Stouffer Corp. (Stouffer), a corporation whose common stock was listed and traded on the New York stock exchange. Stouffer manufactured and sold frozen prepared food, and operated hotels and food management services and restaurants. It consisted of three business segments, and the gross revenues for said segments over the 5-year period 1968 to 1972 were as follows:

| | *Years ended—* | | | | |
| | (Amounts in thousands of dollars) | | | | |
| *Segment* | *7/30/72* | *8/1/71* | *8/2/70* | *8/30/69* | *7/28/68* |
| Frozen prepared foods | $52,825 | $42,912 | $39,892 | $34,408 | $29,423 |
| Inns | 17,149 | 16,058 | 17,178 | 15,264 | 11,963 |
| Restaurants and food services | 53,586 | 51,051 | 53,383 | 54,832 | 54,167 |
| Total | 123,560 | 110,021 | 110,453 | 104,504 | 95,553 |

Stouffer's consolidated net income (before-tax), taxes, and net income (after-tax) were as follows:

| *Fiscal year* | *Net income before tax* | *Taxes on income* | *Net income after tax* |
| 1968 | $4,892,000 | $2,290,000 | $2,602,000 |
| 1969 | 4,276,000 | 2,183,000 | 2,093,000 |

| Fiscal year | Net income before tax | Taxes on income | Net income after tax |
|---|---|---|---|
| 1970 | $4,851,000 | $2,441,000 | $2,410,000 |
| 1971 | 4,363,000 | 2,128,000 | 2,235,000 |
| 1972 | 5,831,000 | 2,527,000 | 3,304,000 |

The pre-tax income figures for 1969, 1970, and 1971 reflect a net loss from a discontinued operation in the amount of $42,000, $198,000, and $452,000, respectively. The pre-tax income figure for 1972 reflects an extraordinary gain from a sale of a leasehold interest in a restaurant in the amount of $807,000.

The financial statements on pages 1090-1095 further reflect Stouffer's financial profile.

In early 1972, Charles B. Thornton (Thornton), the chairman of Litton's board of directors; Joseph Imirie, president of Stouffer; and James Biggar, an executive of Stouffer, discussed project "T.I.B.," i.e., the sale of Stouffer. In July 1972, Litton's board of directors discussed the mechanics and problems of selling Stouffer. As of August 1, 1972, Stouffer's accumulated earnings and profits exceeded $30 million. On August 23, 1972, Stouffer declared a $30 million dividend which it paid to Litton in the form of a $30 million negotiable promissory note, and at that time, Thornton believed that Litton would have no difficulty in receiving an adequate offer for Stouffer. Two weeks later, on September 7, 1972, petitioner announced publicly its interest in disposing of Stouffer. Subsequent to said announcement, Litton received inquiries from a number of interested sources, including TWA, Green Giant, investment banking houses, and business brokers about the possible purchase of all or part of the Stouffer business.

Beginning in mid-September 1972, Litton and several underwriters discussed the feasibility of a public offering of Stouffer Stock. In early September 1972, Litton negotiated with Lehman Bros. for a public offering of Stouffer stock, but Lehman Bros. decided not to participate in the offering. During October 1972, Litton, Stouffer, and Merrill Lynch, a brokerage firm that thought Stouffer had an excellent outlook, prepared a public offering of Stouffer stock. During November 1972, petitioner, Stouffer, and Hornblower and Weeks prepared a partial public offering of Stouffer stock. Merrill Lynch had a policy of not effecting partial distribu-

tions of corporate subsidiaries and thus did not participate in the negotiations with Hornblower and Weeks. In mid-December 1972, Litton decided that a complete public offering was preferable and abandoned the idea of a partial public offering. The S-1 Registration Statement, which Stouffer filed with the Securities and Exchange Commission, stated that $30 million of the proceeds would be used to pay the promissory note which Litton received as a dividend.

On March 1, 1973, Nestle Alimentana S.A. Corp. (Nestle), a Swiss corporation, offered to buy all of Stouffer's stock for $105 million. On March 5, 1973, Nestle paid Litton $74,962,518 in cash for all the outstanding stock of Stouffer and $30 million in cash for the promissory note. Because Litton sold Stouffer to Nestle, the underwriters stopped work on the scheduled public offering.

## OPINION

The issue for decision is whether the $30 million dividend declared by Stouffer on August 23, 1972, and paid to its parent, Litton, by means of a negotiable promissory note was truly a dividend for tax purposes or whether it should be considered part of the proceeds received by Litton from the sale of all of Stouffer's stock on March 1, 1973. If, as petitioner contends, the $30 million constitutes a dividend, petitioner may deduct 85 percent of that amount as a dividend-received credit pursuant to section 243(a),[1] as that section read during the year at issue. However, if the $30 million represents part of the selling price of the Stouffer stock, as contended by respondent, the entire amount will be added to the proceeds of the sale and taxed to Litton as additional capital gain. Respondent's approach, of course produces the larger amount of tax dollars.

The instant case is substantially governed by *Waterman Steamship Corp. v. Commissioner,* 50 T.C. 650 (1968), revd. 430 F.2d 1185 (5th Cir. 1970), cert. denied 401 U.S. 939 (1971). Respondent urges us to follow the opinion of the Fifth Circuit, which in substance adopted the position of Judge Tannenwald's dissent (concurred in by three other

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue.

## The Stouffer Corporation
## Pro Forma Consolidated Balance Sheet[1]
### 1969-1972
### (000s)

| | 7/30/72 $ | 7/30/72 % | 8/1/71 $ | 8/1/71 % | 8/2/70 $ | 8/2/70 % | 8/3/69 $ | 8/3/69 % |
|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | |
| **Current assets:** | | | | | | | | |
| Cash | 1,294 | 2.09 | 2,281 | 4.08 | 1,854 | 3.33 | 1,643 | 3.10 |
| Accounts receivable, net | 7,971 | 12.89 | 7,757 | 13.86 | 8,293 | 14.88 | 8,386 | 15.81 |
| Notes receivable | --- | --- | --- | --- | --- | --- | --- | --- |
| Inventory | 12,086 | 19.54 | 9,763 | 17.45 | 10,940 | 19.63 | 9,656 | 18.20 |
| Prepaid expenses | 576 | 0.93 | 311 | 0.56 | 405 | 0.73 | 312 | 0.59 |
| Total current assets | 21,927 | 35.46 | 20,112 | 35.94 | 21,492 | 38.56 | 19,997 | 37.69 |
| **Fixed assets:** | | | | | | | | |
| Land | 849 | 1.37 | --- | --- | --- | --- | --- | --- |
| Buildings | 20,062 | 32.44 | --- | --- | --- | --- | --- | --- |
| Machinery and equipment | 26,130 | 42.25 | --- | --- | --- | --- | --- | --- |
| Total fixed assets | 47,041 | 76.07 | 40,302 | 72.02 | 35,728 | 64.09 | 31,240 | 58.88 |
| Less accumulated depreciation | (12,039) | (19.47) | (8,783) | (15.69) | (5,637) | (10.11) | (2,549) | (4.80) |
| Total net fixed assets | 35,002 | 56.60 | 31,519 | 56.32 | 30,091 | 53.98 | 28,691 | 54.08 |
| **Other assets:** | | | | | | | | |
| Excess of cost over related net assets of business pur. | 3,692 | 5.97 | 3,692 | 6.60 | 3,692 | 6.62 | 3,692 | 6.96 |
| Other | 1,219 | 1.97 | 638 | 1.14 | 468 | 0.84 | 676 | 1.27 |
| Total other assets | 4,911 | 7.94 | 4,330 | 7.74 | 4,160 | 7.46 | 4,368 | 8.32 |
| Total assets | 61,840 | 100.00 | 55,961 | 100.00 | 55,743 | 100.00 | 53,056 | 100.00 |

| | 7/30/72 | | 8/1/71 | | 8/2/70 | | 8/3/69 | |
|---|---:|---:|---:|---:|---:|---:|---:|---:|
| | $ | % | $ | % | $ | % | $ | % |
| LIABILITIES & STOCKHOLDERS' EQUITY | | | | | | | | |
| Current liabilities: | | | | | | | | |
| Accounts payable | 8,738 | 14.13 | --- | --- | --- | --- | --- | --- |
| Payroll and related expenses | 3,017 | 4.88 | --- | --- | --- | --- | --- | --- |
| Other accrued expenses | 1,465 | 2.37 | 212,410 | 22.18 | 212,491 | 22.41 | 211,650 | 21.96 |
| Taxes on income | 1,115 | 1.80 | 164 | 0.29 | (74) | (0.13) | (147) | (0.28) |
| Current mat. LTD | 97 | --- | 97 | --- | 97 | --- | 97 | --- |
| Total current liabilities | 14,432 | 23.34 | 12,671 | 22.64 | 12,514 | 22.45 | 11,600 | 21.86 |
| Long-term liabilities: | | | | | | | | |
| Long-term debt | 638 | 1.03 | 735 | 1.31 | 830 | 1.49 | 831 | 1.57 |
| Total long-term liabilities | 638 | 1.03 | 735 | 1.31 | 830 | 1.49 | 831 | 1.57 |
| Other liabilities: | | | | | | | | |
| Advances due to parent | 3,906 | 6.32 | 3,055 | 5.46 | 5,534 | 9.93 | 6,683 | 12.60 |
| Deferred income taxes | 1,539 | 2.49 | 1,479 | 2.64 | 1,079 | 1.94 | 566 | 1.07 |
| Total other liabilities | 5,445 | 8.80 | 4,534 | 8.10 | 6,613 | 11.86 | 7,249 | 13.66 |
| Total liabilities | 20,515 | 33.17 | 17,940 | 32.06 | 19,957 | 35.80 | 19,680 | 37.09 |
| Stockholders' equity: | | | | | | | | |
| Common stock, no par value | 1,859 | 3.01 | 1,859 | 3.32 | 1,859 | 3.33 | 1,859 | 3.50 |
| Additional paid-in capital | 18,253 | 29.52 | 18,253 | 32.62 | 18,253 | 32.74 | 18,253 | 34.40 |
| Retained earnings | 21,213 | 34.30 | 17,909 | 32.00 | 15,674 | 28.12 | 13,264 | 25.00 |
| Total stockholders' equity | 41,325 | 66.83 | 38,021 | 67.94 | 35,786 | 64.20 | 33,376 | 62.91 |
| Total liabilities and stockholders' equity | 61,840 | 100.00 | 55,961 | 100.00 | 55,743 | 100.00 | 53,056 | 100.00 |
| Yearend shares outstanding | 1,000 | | 1,000 | | 1,000 | | 1,000 | |
| Equity per share | $41,325.00 | | $38,021.00 | | $35,786.00 | | $38,376.00 | |

[1] Aug. 1, 1969, through Aug. 1, 1971, are WMA calculations based on the Stouffer Corp.'s consolidated statement of changes in financial position.

[2] Includes accounts payable and payroll and related expenses.

SOURCE: The Stouffer Corp.'s SEC Form S-1 Registration Statement dated Feb. 9, 1972.

## The Stouffer Corporation
## Pro Forma Consolidated Statement of Earnings
### 1968-1972
### (000s)

| | 7/30/72 | | 8/1/71 | | 8/2/70 | | 8/3/69 | | 7/28/68 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | $ | % | $ | % | $ | % | $ | % | $ | % |
| Sales and service revenues: | | | | | | | | | | |
| Frozen prepared foods | 52,825 | 42.75 | 42,912 | 39.00 | 39,892 | 36.12 | 34,408 | 32.93 | 29,423 | 30.79 |
| Restaurants and food service | 53,586 | 43.37 | 51,051 | 46.40 | 53,383 | 48.33 | 54,832 | 52.47 | 54,167 | 56.69 |
| Inns | 17,149 | 13.88 | 16,058 | 14.60 | 17,178 | 15.55 | 15,264 | 14.61 | 11,963 | 12.52 |
| Total revenues | 123,560 | 100.00 | 110,021 | 100.00 | 110,453 | 100.00 | 104,504 | 100.00 | 95,553 | 100.00 |
| Cost of sales[1] | 33,563 | 27.16 | 26,962 | 24.51 | 24,717 | 22.38 | 21,841 | 20.90 | 19,037 | 19.92 |
| Cost of service[1] | 59,969 | 48.53 | 56,768 | 51.60 | 58,764 | 53.20 | 59,545 | 56.98 | 54,595 | 57.14 |
| Total cost of goods sold | 93,532 | 75.70 | 83,730 | 76.10 | 83,481 | 75.58 | 81,386 | 77.88 | 73,632 | 77.06 |
| Gross profit | 30,028 | 24.30 | 26,291 | 23.90 | 26,972 | 24.42 | 23,118 | 22.12 | 21,921 | 22.94 |
| Operating, general, and administrative expenses: | | | | | | | | | | |
| Marketing, general and admin.[1] | 20,174 | 16.33 | 16,905 | 15.37 | 17,154 | 15.53 | 14,661 | 14.03 | 13,637 | 14.27 |
| Depreciation/amortization | 3,256 | 2.64 | 3,078 | 2.80 | 3,025 | 2.74 | 2,985 | 2.86 | 2,372 | 2.48 |
| Total operating expense | 23,430 | 18.96 | 19,983 | 18.16 | 20,179 | 18.27 | 17,646 | 16.89 | 16,009 | 16.75 |
| Operating income | 6,598 | 5.34 | 6,308 | 5.73 | 6,793 | 6.15 | 5,472 | 5.24 | 5,912 | 6.19 |

| | 7/30/72 $ | % | 8/1/71 $ | % | 8/2/70 $ | % | 8/3/69 $ | % | 7/28/68 $ | % |
|---|---|---|---|---|---|---|---|---|---|---|
| Other (income) and expense: | | | | | | | | | | |
| Interest income | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Interest expense | 324 | 0.26 | 342 | 0.31 | 542 | 0.49 | 84 | 0.08 | 23 | 0.02 |
| Litton management fee | 1,250 | 1.01 | 1,151 | 1.05 | 1,202 | 1.09 | 1,070 | 1.02 | 997 | 1.04 |
| Total other (inc.) expense | 1,574 | 1.27 | 1,493 | 1.36 | 1,744 | 1.58 | 1,154 | 1.10 | 1,020 | 1.07 |
| Pretax income-continuing ops. | 5,024 | 4.07 | 4,815 | 4.38 | 5,049 | 4.57 | 4,318 | 4.13 | 4,892 | 5.12 |
| Provision for income taxes | 2,285 | 1.85 | 2,128 | 1.93 | 2,441 | 2.21 | 2,183 | 2.09 | 2,290 | 2.40 |
| Net income from continuing ops. | 2,739 | 2.22 | 2,687 | 2.44 | 2,608 | 2.36 | 2,135 | 2.04 | 2,602 | 2.72 |
| Net loss from discontinued ops. | --- | --- | (452) | (0.41) | (198) | (0.18) | (42) | (0.04) | --- | --- |
| Net income before extra. gain | 2,739 | 2.22 | 2,235 | 2.03 | 2,410 | 2.18 | 2,093 | 2.00 | 2,602 | 2.72 |
| Extra. gain, net of income taxes of $242,000² | 565 | 0.46 | --- | --- | --- | --- | --- | --- | --- | --- |
| Net income | 3,304 | 2.67 | 2,235 | 2.03 | 2,410 | 2.18 | 2,093 | 2.00 | 2,602 | 2.72 |
| Effective tax rate | 45.5% | | 42.2% | | 48.3% | | 50.6% | | 46.8% | |

¹Exclusive of depreciation.
²From disposition of leasehold interest in a restaurant.
SOURCE: The Stouffer Corp.'s SEC Form S-1 Registration Statement dated Feb. 9, 1973.

### The Stouffer Corporation
### Consolidated Statement of Changes in Financial Position
### 1970-1972
### (000s)

| | 7/30/72 | | 8/1/71 | | 8/2/70 | |
|---|---|---|---|---|---|---|
| | $ | % | $ | % | $ | % |
| Sources of Funds | | | | | | |
| From operations: | | | | | | |
| Net earnings from continuing operations, including gain from sale of leasehold interest of $565,000 in 1972 | 3,304 | 38.34 | 2,687 | 40.94 | 2,608 | 38.47 |
| Net loss from discontinued operations | - - - | - - - | (452) | (6.89) | (198) | (2.92) |
| Non-cash charges to income: | | | | | | |
| Depreciation and amortization | 3,256 | 37.78 | 3,146 | 47.93 | 3,088 | 45.55 |
| Deferred income taxes | 60 | 0.70 | 400 | 6.09 | 513 | 7.57 |
| Total funds provided from operations | 6,620 | 76.82 | 5,781 | 88.07 | 6,011 | 88.66 |
| Proceeds from loans on officers' life insurance | - - - | - - - | - - - | - - - | 413 | 6.09 |
| Sale or retirement of property, plant, and equipment | 1,147 | 13.31 | 783 | 11.93 | 356 | 5.25 |
| Advances from parent, net | 851 | 9.87 | - - - | - - - | - - - | - - - |
| Total sources of funds | 8,618 | 100.00 | 6,564 | 100.00 | 6,780 | 100.00 |

|  | 7/30/72 | | 8/1/71 | | 8/2/70 | |
|---|---|---|---|---|---|---|
|  | $ | % | $ | % | $ | % |
| APPLICATION OF FUNDS |  |  |  |  |  |  |
| Additions to property, plant, and equipment | 7,886 | 92.08 | 5,357 | 66.13 | 4,844 | 78.14 |
| Reduction of long-term debt | 97 | 1.13 | 95 | 1.17 | 414 | 6.68 |
| Repayment of advances from parent, net | - - - | - - - | 2,479 | 30.60 | 1,149 | 18.54 |
| Increase in deferred preopening expenses | 385 | 4.50 | 130 | 1.60 | - - - | - - - |
| Other, net | 196 | 2.29 | 40 | 0.49 | (208) | (3.36) |
| Total application of funds | 8,564 | 100.00 | 8,101 | 100.00 | 6,199 | 100.00 |
| Increase (decrease) in working capital | 54 | - - - | (1,537) | - - - | 581 | - - - |
| Increase (decrease) in working capital components: |  |  |  |  |  |  |
| Cash | (987) |  | 427 |  | 211 |  |
| Accounts receivable | 214 |  | (536) |  | (93) |  |
| Inventories | 2,323 |  | (1,177) |  | 1,284 |  |
| Prepaid expenses | 265 |  | (94) |  | 93 |  |
| Accounts payable and accrued expenses | (806) |  | 83 |  | (820) |  |
| Taxes on income | (951) |  | (238) |  | (73) |  |
| Other, net | (4) |  | (2) |  | (21) |  |
|  | 54 |  | (1,537) |  | 581 |  |

SOURCE: The Stouffer Corp.'s SEC Form S-1 Registration Statement dated Feb. 9, 1973.

judges) from our Court-reviewed opinion. If we hold for respondent, we must overrule our majority opinion in *Waterman Steamship*. Petitioner contends that the reasoning of the Fifth Circuit in *Waterman Steamship* should not apply since the facts here are more favorable to petitioner. Additionally, petitioner points out that several business purposes were served by the distribution here which provide additional support for recognition of the distribution as a dividend. For the reasons set forth below, we conclude that the $30 million distribution constituted a dividend which should be recognized as such for tax purposes. We believe that the facts in the instant case lead even more strongly than did the facts in *Waterman Steamship* to the conclusion that the $30 million was a dividend. Accordingly, we hold that the Stouffer distribution to Litton was a dividend within the meaning of section 243(a).

In many respects, the facts of this case and those of *Waterman Steamship* are parallel. The principal difference, and the one which we find to be most significant, is the timing of the dividend action. In *Waterman Steamship*, the taxpayer corporation received an offer to purchase the stock of two of its wholly owned subsidiary corporations, Pan-Atlantic and Gulf Florida, for $3,500,000 cash. The board of directors of Waterman Steamship rejected that offer but countered with an offer to sell the two subsidiaries for $700,000 after the subsidiaries declared and arranged for payments of dividends to Waterman Steamship amounting in the aggregate to $2,800,000. Negotiations between the parties ensued, and the agreements which resulted therefrom included, in specific detail, provisions for the declaration of a dividend by Pan-Atlantic to Waterman Steamship prior to the signing of the sales agreement and the closing of that transaction. Furthermore, the agreements called for the purchaser to loan or otherwise advance funds to Pan-Atlantic promptly in order to pay off the promissory note by which the dividend had been paid. Once the agreement was reached, the entire transaction was carried out by a series of meetings commencing at 12 noon on January 21, 1955, and ending at 1:30 p.m. the same day. At the first meeting, the board of directors of Pan-Atlantic met and declared a dividend in the form of a promissory note in

the amount of $2,799,820. The dividend was paid by execution and delivery of the promissory note. At 12:30 p.m., the board of directors of the purchaser's nominee corporation (Securities) met and authorized the purchase and financing of Pan-Atlantic and Gulf Florida. At 1 p.m., the directors of Waterman authorized the sale of all outstanding stock of Pan-Atlantic and Gulf Florida to Securities. Immediately following that meeting, the sales agreement was executed by the parties. The agreement provided that the purchaser guaranteed prompt payment of the liabilities of Pan-Atlantic and Gulf Florida including payment of any notes given by either corporation as a dividend.

Finally, at 1:30 p.m., the new board of directors of Pan-Atlantic authorized the borrowing of sufficient funds from the purchaser personally and from his nominee corporation to pay off the promissory note to Waterman Steamship, which was done forthwith. As the Fifth Circuit pointed out, "By the end of the day and within a ninety minute period, the financial cycle had been completed. Waterman had $3,500,000, hopefully tax-free, all of which came from Securities and McLean, the buyers of the stock." 430 F.2d at 1190. This Court concluded that the distribution from Pan-Atlantic to Waterman was a dividend. The Fifth Circuit reversed, concluding that the dividend and sale were one transaction. 430 F.2d at 1192.

The timing in the instant case was markedly different. The dividend was declared by Stouffer on August 23, 1972, at which time the promissory note in payment of the dividend was issued to Litton. There had been some general preliminary discussions about the sale of Stouffer, and it was expected that Stouffer would be a very marketable company which would sell quickly. However, at the time the dividend was declared, no formal action had been taken to initiate the sale of Stouffer. It was not until 2 weeks later that Litton publicly announced that Stouffer was for sale. There ensued over the next 6 months many discussions with various corporations, investment banking houses, business brokers, and underwriters regarding Litton's disposition of Stouffer through sale of all or part of the business to a particular buyer, or through full or partial public

offerings of the Stouffer stock. All of this culminated on March 1, 1973, over 6 months after the dividend was declared, with the purchase by Nestle of all of Stouffer's stock. Nestle also purchased the outstanding promissory note for $30 million in cash.

In the instant case, the declaration of the dividend and the sale of the stock were substantially separated in time in contrast to *Waterman Steamship* where the different transactions occurred essentially simultaneously. In *Waterman Steamship*, it seems quite clear that no dividend would have been declared if all of the remaining steps in the transaction had not been lined up in order on the closing table and did not in fact take place. Here, however, Stouffer declared the dividend, issued the promissory note, and definitely committed itself to the dividend before even making a public announcement that Stouffer was for sale. Respondent argues that the only way petitioner could ever receive the dividend was by raising revenue through a sale of Stouffer. Therefore, respondent asserts the two events (the declaration of the dividend and then the sale of the company) were inextricably tied together and should be treated as one transaction for tax purposes. In our view, respondent ignores the fact that Stouffer could have raised sufficient revenue for the dividend from other avenues, such as a partial public offering or borrowing. Admittedly, there had been discussions at Litton about the sale of Stouffer which was considered to be a very salable company. However, there are many slips between the cup and the lip, and it does not take much of a stretch of the imagination to picture a variety of circumstances under which Stouffer might have been taken off the market and no sale consummated. Under these circumstances, it is unlikely that respondent would have considered the dividend to be a nullity. On the contrary, it would seem quite clear that petitioner would be charged with a dividend on which it would have to pay a substantial tax. Petitioner committed itself to the dividend and, thereby, accepted the consequences regardless of the outcome of the proposed sale of Stouffer stock. See *Crellin v. Commissioner*, 17 T.C. 781, 785 (1951), affd. 203 F.2d 812 (9th Cir. 1953), cert. denied 346 U.S. 873 (1953).

Since the facts here are distinguishable in important respects and are so much stronger in petitioner's favor, we do not consider it necessary to consider further the opinion of the Fifth Circuit in *Waterman Steamship.*

The term "dividend" is defined in section 316(a) as a distribution by a corporation to its shareholders out of earnings and profits. The parties have stipulated that Stouffer had earnings and profits exceeding $30 million at the time the dividend was declared. This Court has recognized that a dividend may be paid by a note. *T.R. Miller Mill Co. v. Commissioner,* 37 B.T.A. 43, 49 (1938), affd. 102 F.2d 599 (5th Cir. 1939). Based on these criteria, the $30 million distribution by Stouffer would clearly constitute a dividend if the sale of Stouffer had not occurred. We are not persuaded that the subsequent sale of Stouffer to Nestle changes that result merely because it was more advantageous to Litton from a tax perspective.

It is well established that a taxpayer is entitled to structure his affairs and transactions in order to minimize his taxes. This proposition does not give a taxpayer carte blanche to set up a transaction in any form which will avoid tax consequences, regardless of whether the transaction has substance. *Gregory v. Helvering,* 293 U.S. 465 (1935). A variety of factors present here preclude a finding of sham or subterfuge. Although the record in this case clearly shows that Litton intended at the time the dividend was declared to sell Stouffer, no formal action had been taken and no announcement had been made. There was no definite purchaser waiting in the wings with the terms and conditions of sale already agreed upon. At that time, Litton had not even decided upon the form of sale of Stouffer. Nothing in the record here suggests that there was any prearranged sale agreement, formal or informal, at the time the dividend was declared.

Petitioner further supports its argument that the transaction was not a sham by pointing out Litton's legitimate business purposes in declaring the dividend. Although the code and case law do not require a dividend to have a business purpose, it is a factor to be considered in determining whether the overall transaction was a sham. *T.S.N. Liquidating Corp. v. United States,* 624 F.2d 1328

(5th Cir. 1980). Petitioner argues that the distribution allowed Litton to maximize the gross after-tax amount it could receive from its investment in Stouffer. From the viewpoint of a private purchaser of Stouffer, it is difficult to see how the declaration of a dividend would improve the value of the stock since creating a liability in the form of a promissory note for $30 million would reduce the value of Stouffer by approximately that amount. However, since Litton was considering disposing of all or part of Stouffer through a public or private offering, the payment of a dividend by a promissory note prior to any sale had two advantages. First, Litton hoped to avoid materially diminishing the market value of the Stouffer stock. At that time, one of the factors considered in valuing a stock, and in determining the market value of a stock was the "multiple of earnings" criterion. Payment of the dividend by issuance of a promissory note would not substantially alter Stouffer's earnings. Since many investors were relatively unsophisticated, Litton may have been quite right that it could increase its investment in Stouffer by at least some portion of the $30 million dividend. Second, by declaring a dividend and paying it by a promissory note prior to an anticipated public offering, Litton could avoid sharing the earnings with future additional shareholders while not diminishing to the full extent of the pro rata dividend, the amount received for the stock. Whether Litton could have come out ahead after Stouffer paid the promissory note is at this point merely speculation about a public offering which never occurred. The point, however, is that Litton hoped to achieve some business purpose, and not just tax benefits, in structuring the transaction as it did.

Under these facts, where the dividend was declared 6 months prior to the sale of Stouffer, where the sale was not prearranged, and since Stouffer had earnings and profits exceeding $30 million at the time the dividend was declared, we cannot conclude that the distribution was merely a device designed to give the appearance of a dividend to a part of the sales proceeds. In this case, the form and substance of the transaction coincide; it was not a transaction entered into solely for tax reasons, and it should be recognized as structured by petitioner.

On this record, we hold that for Federal tax purposes Stouffer declared a dividend to petitioner on August 23, 1972, and, subsequently, petitioner sold all of its stock in Stouffer to Nestle for $75 million.

*Decision will be entered under Rule 155.*