T.C. Memo. 1995-505


UNITED STATES TAX COURT


THOR ENERGY RESOURCES AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 23161-92.                    Filed October 23, 1995.


<u>Salvador E. Rodriguez</u>, for petitioner.

<u>Dennis M. Kelly</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

CLAPP, <u>Judge</u>:  Respondent determined a deficiency in
petitioner's Federal corporate income tax for the year ended
January 31, 1989, in the amount of $25,633.

After concessions by the parties, the issue for decision is whether Shefferman & Bigelson Co. (S&B) distributed a dividend to Thor Energy Resources, Inc. (Thor), in the amount of $1,245,880.36, and if so, the effect of that distribution on Thor's sale of S&B stock.  We hold that the $1,245,880.36 constitutes a portion of the sale price of the S&B stock, and S&B did not distribute a dividend in that amount.

All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

## FINDINGS OF FACT

Some of the facts are stipulated and are so found.  We incorporate by reference the stipulation of facts and attached exhibits.

Petitioner is Thor and subsidiaries.  Thor is a corporation organized under the laws of the State of Delaware and is engaged through its subsidiaries in oil and gas exploration and production, with its principal business location in Tyler, Texas. Thor's board of directors included LaVelle D. Fender, David M. Fender, Harris R. Fender, Jr., B. Bruce Freitag, and Leroy LaSalle.  David M. Fender served as Thor's president and chief executive officer.

S&B is a corporation organized under the laws of the District of Columbia on January 25, 1960, and its principal

business activities included mechanical, electrical, and plumbing engineering services. In 1987, Thor acquired 100 percent of the issued and outstanding stock of S&B. S&B's board of directors included LaVelle D. Fender, David M. Fender, and Sol M. Shefferman. LaVelle D. Fender is David M. Fender's mother, and she served as chairman of the board of directors of S&B.

During the tax year ending January 31, 1989, S&B was a member of an affiliated group of corporations, as defined under section 1504, and Thor was the common parent of that affiliated group. Thor filed a consolidated return with the affiliated group for the tax year ending January 31, 1989, which included S&B for the period beginning February 1, 1988, and ending November 17, 1988. Thor owned 100 percent of the S&B stock during the entire period that S&B was a member of the affiliated group.

In March 1988, Thor began negotiating with a management group of S&B employees (the management group) regarding the management group's desire to acquire S&B from Thor. The management group intended that an employee stock ownership plan would hold the S&B shares after they were acquired from Thor. The management group formed S&B Acquisition Co. (the Buyer) to purchase the S&B stock.

The S&B board of directors held a telephone conference special meeting on April 26, 1988, and discussed the status of the management group's proposal to purchase the S&B stock from

Thor. During that meeting S&B's board set a target date of August 1, 1988, for closing on the management group's purchase of the S&B stock. The S&B board agreed to meet again on May 17, 1988, to discuss the management group's proposal. S&B's board held quarterly meetings, and these meetings were always held by telephone conference. The corporate secretary for S&B would prepare minutes of the meeting, and these minutes would be approved at each subsequent meeting.

Prior to July 5, 1988, Thor provided the management group with a stand-still agreement that was effective until the anticipated S&B stock closing in early September 1988. At their annual meeting held on July 12, 1988, Thor's board of directors discussed and approved the Buyer's offer.

In a letter dated September 27, 1988, to each of the members of Thor's board of directors, David M. Fender (Fender) described generally the sale of S&B and forwarded to each director a "UNANIMOUS CONSENT OF DIRECTORS" form seeking consent of Thor's board for Thor to enter into a stock purchase agreement with the Buyer. In that letter, Fender described the sale price of the S&B stock to the Buyer as $3.3 million (net cash), plus cancellation of approximately $724,000 of the intercompany receivable due to S&B from Thor.

On September 30, 1988, Thor's board of directors authorized the sale of the S&B stock pursuant to the terms of a stock purchase agreement (SPA), and on October 3, 1988, Thor, as

seller, and the Buyer executed the SPA regarding the sale of the S&B stock.  The relevant sections of the SPA provide:

   4.6  <u>Corporate Documents</u>.  Complete and correct copies of the articles or certificate of incorporation of the Company [S&B] and all amendments thereto, certified by the Secretary of State or comparable official of its jurisdiction of incorporation, and the bylaws of the Company, as amended, certified by its Secretary, are attached hereto as Exhibit A.  The Company is not in default in the performance, observation or fulfillment of its articles or certificate of incorporation or bylaws.  The minute books of the Company as previously furnished to the Buyer are complete and correctly reflect in all material respects all formal meetings of directors (including committees thereof) and stockholders, and correctly record all resolutions, certified copies of which have been delivered to other parties.  No material transactions or actions have been approved at any informal meeting of directors or stockholders the minutes of which are not included in such minute books.

   *     *     *     *     *     *     *

   4.8  <u>Financial Statements</u>.

   (a)  Attached hereto as Exhibit B are true and complete copies of the unaudited balance sheets of the Company as at January 31, 1988 and January 31, 1987, and the related statements of operations and changes in financial position for the years ended January 31, 1988 and January 31, 1987, and the unaudited balance sheets of the Company as at July 31, 1988 and the related statements of operations and changes in financial position for the six month period ended July 31, 1988 (collectively, the "Financial Statements").

   (b)  The Financial Statements (including the notes thereto) are true and correct in all material respects, are in accordance with the books and records of the Company present fairly the financial condition and results of operations of the Company at and for the periods indicated, and have been prepared in accordance with generally accepted accounting principles applied on a consistent basis.

(c)  All notes and accounts receivable of the
Company shown on the balance sheets as at July 31, 1988
contained in the Financial Statements, or thereafter
acquired, have been paid or collected or are current
and will be collectible (in the case of any such notes,
in accordance with their terms, and in the case of any
such accounts receivable, within 360 days after
billing) at the aggregate recorded amounts thereof on
the books of the Company, less applicable reserves
provided therefor on such balance sheets, which
reserves have been computed in accordance with
generally accepted accounting principles and are
adequate.

(d)  The Company has no liabilities, commitments
or obligations of any nature, whether absolute,
accrued, contingent, known or unknown, due or to become
due or otherwise, except (i) as reflected in its July
31, 1988 balance sheet included as part of the
Financial Statements and not heretofore discharged,
(ii) as incurred as a result of the normal and ordinary
course of its business since the date of such balance
sheet, none of which is materially adverse, or (iii) as
set forth in Schedule 4.8 attached hereto.

*       *       *       *       *       *       *

4.18.  No Material Change.  Since July 31, 1988,
except as disclosed in Schedule 4.18 attached hereto,
there has not been, to the best knowledge of the Seller
[Thor], and prior to the Closing there will not be
(except with the prior approval of the Buyer and the
Seller):

     (i) any materially adverse change
     (whether or not in the ordinary and usual
     course of business) in the financial
     condition, net worth, assets, liabilities,
     personnel, business, or results of operations
     of the Company,

*       *       *       *       *       *       *

     (iii) any material increase in the
     compensation payable or to become payable by
     the Company to its officers or key employees,
     pursuant to any agreement, bonus, insurance,
     pension or other beneficial plan or

arrangement made to or for the benefit of any such officers or key employees,

(iv) any loan, guarantee, gift, bonus, pension, retirement, insurance, death or other fringe benefit accrued, paid or granted to any officer or employee of the Company,

(v) any loans to or borrowing by the Company, any mortgage or pledge with respect to any of its properties or assets or any assumption, guarantee, endorsement or other agreement to become liable (directly, contingently or otherwise) for the obligations of any other person or entity,

\*       \*       \*       \*       \*       \*       \*

(vii) any sale or disposition (or agreement to sell or dispose) of any assets, tangible or intangible, of the Company except in the ordinary course of business,

(viii) any cancellation or compromise (or agreement to cancel or compromise) any debts owed or claims of the Company,

(ix) any declaration or payment of any dividend or other distribution in respect of, or purchase, redemption or acquisition of any shares of the capital stock of the Company,

\*       \*       \*       \*       \*       \*       \*

(xii) any other event or condition of any character pertaining to and materially adversely affecting the Company or its business.

\*       \*       \*       \*       \*       \*       \*

4.20  Intercompany Documents.  Schedule 4.20 attached hereto sets forth a true and complete list of all agreements, contracts, commitments and understandings (including, but not limited to, intercompany loans) between the Company and/or the Seller or between either of the foregoing and any of their affiliates.

\*          \*          \*          \*          \*          \*          \*

     7.4  <u>Loans Repaid</u>.  Except as provided in Section 8.4 below with respect to Intercompany Advances, all loans made by the Company to the Seller or any affiliate thereof, shall have been repaid in full, including all applicable interest.  All amounts reflected on the July 31 balance sheet as "Dividends Payable" shall be cancelled effective as of the date of Closing.

\*          \*          \*          \*          \*          \*          \*

     8.4  <u>Cancellations</u>.  All amounts reflected in the July 31, 1988 Financial Statements of "Intercompany Advances" shall be cancelled, effective as of the date of Closing.

\*          \*          \*          \*          \*          \*          \*

Schedule 4.8:  <u>Undisclosed contingent liabilities</u>
None.

\*          \*          \*          \*          \*          \*          \*

Schedule 4.18:  <u>Material changes since July 31, 1988</u>
None.

\*          \*          \*          \*          \*          \*          \*

Schedule 4.20:  <u>Intercompany documents</u>
None.

     S&B's July 31, 1988, financial statements indicate "intercompany accounts and investments" of negative $724,000.  No "dividends payable" are reflected on S&B's July 31, 1988, balance sheet.

     On October 3, 1988, Thor announced publicly that it had executed an agreement to sell the outstanding stock of S&B in

exchange for $3.5 million cash and cancellation of a $724,000

intercompany receivable owed by Thor to S&B.

The S&B board of directors held a telephone conference

special meeting on November 14, 1988.  The minutes of that

meeting state:

> RATIFICATION
>     Mr. Fender asked for ratification by the Board of
> the previous informal discussion after the previous
> meeting concerning the declaration on April 29, 1988,
> of an asset distribution dividend to the shareholders
> of record on May 31, 1988.  The dividend will consist
> of the balance classified on the Company's books as
> "Intercompany" and will be distributed in the same form
> and character as it is carried on the Company's books
> as of six months from the date of declaration.  The
> dividend will be distributed on January 31, 1989.
> There will be no adverse tax consequences to Shefferman
> & Bigelson Company.  Mr. Shefferman made a motion that
> the Board ratify the details set out above regarding
> the informal discussion after the previous meeting.
> Mrs. Fender seconded and the motion carried
> unanimously.

There were no restrictions, qualifications, or contingencies

associated with the payment of the dividend distribution

referenced in the minutes of the November 14, 1988, meeting.

Richard Anderson, an accountant who advised petitioner on the S&B

stock sale, did not attend or participate in any April 29, 1988,

meeting of the S&B board of directors, and there are no minutes

of that April 29, 1988, meeting.

On November 17, 1988, Thor and the Buyer entered into an

agreement whereby the Buyer approved, pursuant to section 4.18 of

the SPA, the dividend declaration set forth in the November 14,

1988, minutes of the S&B board meeting, and the Buyer waived any rights or causes of action that the Buyer may have had under the SPA stemming from the dividend declaration. On November 17, 1988, Thor delivered 100 percent of the S&B stock to the Buyer, and Thor received $3.5 million cash. On November 18, 1988, Thor issued a press release stating that Thor had consummated the sale of S&B, and the "net sales proceeds after deduction of the related transaction costs was $3.3 Million plus certain accumulated tax benefits."

S&B maintained an "intercompany account" to record transactions between Thor and S&B. The books of S&B reveal the following intercompany account balances that represent funds transferred to Thor from S&B:

| As of | Amount due from Thor |
|-------|----------------------|
| Feb.  1, 1988 | $993,880.36 |
| July 31, 1988 | 724,000.00 |
| Oct. 29, 1988 | 1,245,880.36 |
| Nov. 17, 1988 | 1,245,880.36 |

In November 1988, S&B recorded on its books a dividend payable in the amount of $1,245,880.36 and charged the same amount against preacquisition retained earnings and profits of S&B. On January 31, 1989, S&B and Thor each offset the intercompany account balance due S&B from Thor and the dividend

payable amounts due Thor from S&B and removed these items from their respective books.

OPINION

Petitioner argues that S&B declared a dividend, and then in a separate transaction, Thor sold the stock of S&B to the Buyer. Petitioner concludes that the dividend and the subsequent sale are independent transactions that fall within the purview of Litton Indus., Inc. v. Commissioner, 89 T.C. 1086 (1987), and that the regulations relied on by respondent are inapplicable to the facts of this case.  Respondent argues that, assuming S&B paid a dividend in the amount of $1,245,880.36, Thor must reduce its basis in the S&B stock by the amount of the dividend pursuant to section 1.1502-32(b)(2)(iii), Income Tax Regs., if the dividend was paid before the stock sale transaction or, in the alternative, pursuant to section 1.1502-32(b)(2)(iii), Income Tax Regs., in combination with section 1.1502-32T(b), Temporary Income Tax Regs., 54 Fed. Reg. 10981 (Mar. 16, 1989), if the dividend was paid after the stock sale transaction.  Petitioner bears the burden of proving that respondent's determination is not correct.  Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).

Petitioner took the position during trial, presented evidence, and argued on brief that a dividend had been declared and paid.  Respondent, in her brief, conceded that there had been a dividend and argued that the effect of the dividend in this

context was negated by application of section 1.1502-32(b)(2)(iii), Income Tax Regs., and section 1.1502-32T(b), Temporary Income Tax Regs., supra, the later section being promulgated on March 14, 1989, and applicable to distributions described in section 301 that are declared in taxable years for which the due date (without extensions) of the Federal income tax return is after March 14, 1989. We are not bound by a concession if we conclude that it is contrary to the facts. Weinberg v. Commissioner, 44 T.C. 233, 244 (1965), affd. in part, revd. in part and remanded sub nom. Commissioner v. Sugar Daddy, Inc., 386 F.2d 836 (9th Cir. 1967). We find that S&B paid no dividend and that Thor and the Buyer agreed to cancel the $1,245,880.36 debt payable to S&B from Thor as part of the purchase price of the S&B stock. Respondent's concession made without regard to, and contrary to, the evidence in this case will not change our conclusion. It is therefore unnecessary to consider the validity of the cited regulations. We hold that S&B never declared or paid a dividend to Thor.

Petitioner argues that S&B declared a dividend on April 29, 1988, as memorialized in the minutes of S&B's board meeting on November 14, 1988. We find that S&B did not declare a dividend.

None of the relevant financial documents indicate that S&B declared a dividend. S&B's financial statements of July 31, 1988, do not reflect any dividends payable as of that date. The parties executed the SPA on October 3, 1988, and any dividend

declared by S&B on April 29, 1988, should have been revealed in one or more of the SPA sections 4.8, 4.18, or 4.20. Yet no dividend is mentioned in the corresponding schedules in the SPA. It was not until November 1988 that S&B recorded on its books a dividend payable in the amount of $1,245,880.36 and charged the same amount against preacquisition retained earnings and profits of S&B.

We conclude that the minutes of S&B's board meeting held on November 14, 1988, did not reflect accurately events, if any, that transpired on April 29, 1988. Fender testified as follows:

Q. Was there a meeting of the board of April 29, 1988, wherein the board of directors of the subsidiary declared a dividend from the subsidiary to the parent?

A. I don't specifically recall it, but it was our practice to have a meeting every quarter and we obviously did, based on the ratification of the minutes of that meeting in November. * * *

Petitioner's only other witness at trial, Richard Anderson, had no personal knowledge of any meeting or informal discussion of the S&B board on April 29, 1988. The minutes of the special meeting of S&B's board of directors held on April 26, 1988, indicate that the board discussed the status of the management group's proposal to purchase the S&B stock, but there is no mention of S&B's declaring a dividend.

Petitioner argues that, pursuant to Litton Indus., Inc. v. Commissioner, 89 T.C. 1086 (1987), the amount at issue in this case constitutes a dividend to Thor and not part of the proceeds

received from the sale of the S&B stock.  In <u>Litton Industries</u>, Litton's board of directors discussed the sale of its subsidiary (Stouffer) in early 1972.  On August 23, 1972, Stouffer declared and paid a $30 million dividend, and on September 7, 1972, Litton announced publicly its interest in disposing of Stouffer.  From September 1972 through December 1972, Litton and Stouffer discussed with various underwriters a public offering of Stouffer stock.  On March 1, 1973, Nestle Alimentana S.A. Corp. (Nestle) offered to buy all of Stouffer's stock, and Litton completed that sale to Nestle on March 5, 1973.

When Stouffer declared a dividend, Litton had taken no formal action to initiate the sale of Stouffer.  <u>Id.</u> at 1097.  In contrast, during their special meeting on April 26, 1988, which was before the alleged dividend declaration on April 29, 1988, S&B's board of directors set a target date of August 1, 1988, for closing on the management group's purchase of the S&B stock. There is no evidence that Thor discussed the sale of S&B to any buyer other than the management group.  Litton, on the other hand, discussed the disposition of Stouffer with various corporations, investment banking houses, business brokers, and underwriters.  <u>Id.</u>  Stouffer declared a dividend and definitely committed itself to the dividend before even making a public announcement that Stouffer was for sale.  <u>Id.</u> at 1098.  This is in stark contrast to S&B's alleged dividend that did not surface until November 14, 1988, 3 days before Thor's sale of the S&B

stock to the Buyer.  This case is controlled by the principles set forth in <u>Waterman Steamship Corp. v. Commissioner</u>, 430 F.2d 1185 (5th Cir. 1970), revg. 50 T.C. 650 (1968).  Here, as in <u>Waterman Steamship</u>, there was no dividend, only an adjustment in the sale price of the S&B stock.

Petitioner's dividend argument is nothing more than a belated attempt by Thor and/or S&B to acquire some perceived tax advantages by offsetting the intercompany account balance due from Thor with a dividend from S&B.  We hold that S&B neither declared nor paid a dividend to Thor, and that Thor and the Buyer merely agreed to cancel the intercompany account balance due from Thor to S&B as part of the purchase price of the S&B stock.

To reflect the foregoing and the concessions by the parties,

<u>Decision will be entered under Rule 155.</u>