CLARENCE W. MILLER AND EMMA L. MILLER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

RAYMOND S. MILLER AND JOSEPHINE MILLER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

FRANK NOWATZKI AND LILLIAN NOWATZKI, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 55150, 55351, 55352.    Filed April 25, 1956.

*Howard R. Slater, Esq.*, for the petitioners in Docket No. 55150.
*Clarence R. Serb, Esq.*, for the petitioners in Docket Nos. 55351 and 55352.
*Paul Levin, Esq.*, for the respondent.

152

156

OPINION.

TIETJENS, *Judge:* The question here is whether the dividend declared on the stock of Tiny Tot Safety Table Company was the income of the seller or buyers of the company's stock. The agreement for the sale of stock was dated July 29, 1950; the dividend was declared the same day, made payable on August 4, 1950, out of the earned surplus of the corporation, to the shareholders of record on July 28, 1950. The dividend checks were dated August 7, 1950.

On behalf of the seller, petitioner C. W. Miller, it is urged that the dividend should be included in the buyers' gross income because they were the equitable owners of the stock at the time the dividend was declared and when it was paid. The buyers, on the other hand, claim that the agreement of July 29, 1950, did not become effective until August 5, 1950, so that they had no right to the stock until then and no right to the dividend declared on July 29, 1950.

In support of his position the seller relies on *Moore* v. *Commissioner*, 124 F. 2d 991 (C. A. 7, 1941); *De Guire* v. *Higgins*, 159 F. 2d 921 (C. A. 2, 1947), certiorari denied 331 U. S. 858 (1947); *Northern Trust Co. of Chicago* v. *United States*, 193 F. 2d 127 (C. A. 7, 1951), cer-

tiorari denied 343 U. S. 956 (1952); and *Estate of Arthur L. Hobson*, 17 T. C. 854 (1951) (Acq., 1952–1 C. B. 2; petition for review dismissed on Commissioner's motion with taxpayer's consent). In *Moore* the taxpayer sold shares of stock for $96,000 pursuant to an agreement of December 31, 1935. $43,904 was paid in cash at the time of the agreement and the debt for the rest of the purchase price was evidenced by four promissory notes executed by the buyer, of the same date as the agreement, payable over a 3-year period or earlier at the maker's option. The share certificates, endorsed in blank, were attached to the notes and deposited with an escrow agent. As each note was paid with interest the shares attached to it were to be delivered to the buyer. If the buyer failed to pay any note when due, the stock was to be delivered to the seller and the note to the buyer. The seller was to have the right to vote the stock for the directors nominated by the buyer, and to vote the stock with other restrictions. All dividends paid on the shares during the life of the agreement were to be credited by the recipient on the principal and interest of the note next due. The buyer was not personally liable for the rest of the purchase price either on the notes or under the agreement, and the seller's only remedy for failure to pay the notes was to take back the stock. Thereafter, on December 1, 1936, the corporation declared and paid (on the 15th) a dividend of $28,000 on the shares in question. The dividend check was made payable to the seller, she being the record owner of the shares; the seller endorsed it in blank and turned it over to the buyer, who had it certified and delivered it to the escrow agent in payment of two of the notes, the rest of the payment to be applied to the third note. New share certificates, in the number of shares paid for, were then issued to the buyer. The check was then turned over to the seller by the escrow agent. The Commissioner sought to charge the seller with ordinary income in the amount of the dividend in the year paid, 1936. The court held that the dividend was not taxable income to the seller because (a) title to the stock passed to the buyer upon execution of the contract, since the stock was then completely beyond the seller's control and nothing remained for her to do to divest herself of title; and (b) even if title to the stock was in the seller, it was only to secure payment of the rest of the purchase price, and the beneficial use of the property was in the buyer.

*De Guire* v. *Higgins, supra*, was an attempt by the Commissioner to charge the buyer of the same shares of stock with income from dividends declared and paid in 1936 and 1937, and the Second Circuit agreed that the income was properly chargeable to the buyer. The court thought it unnecessary to pass upon the question of ownership of the shares. It felt that the only effect of the contract was to suspend

the ultimate ownership of the dividend until the buyer exercised his option, whereupon it became the buyer's, being used to pay off his obligation, and was then chargeable to him as income. In a concurring opinion Judge Clark thought that the dividend income should be taxable to the person having the greater number of attributes of ownership of the shares; that unless and until he chose not to buy, the buyer substantially controlled not merely the stock of the corporation, but the corporation itself, its officers, directors, and policies.

The later case of *Northern Trust Co. of Chicago* v. *United States*, *supra*, involved a factual situation substantially similar to that in *Moore* and *De Guire*. The agreement of sale in that case specifically provided that title to certificate of stock placed in escrow "shall vest in the purchaser only upon payment in full of the whole purchase price." The Seventh Circuit, following its decision in *Moore* and the Second Circuit's decision in *De Guire*, held that the dividend in question, declared 4 months after the sales agreement was executed, was income to the purchaser. The basis of its decision was that at the time the dividend was declared the purchaser was the beneficial owner of the stock. The court said, at page 131:

Under the statute this dividend was taxable to the stockholder to whom it belonged. The seller and the purchaser of the stock could not so manipulate their contracts or so frame them as to evade the tax due. Clearly the income is that of the beneficial owner of the stock, and under the decision of this court in the Moore case and that of the Second Circuit in the De Guire case, which are not to be distinguished from the present case, it follows clearly, we think, that the purchaser, who was the beneficial owner of the stock, received the full benefit of the dividend; that he alone was entitled to receive it, as the beneficial owner, and that he realized income in its receipt and disposition by application upon what he still owed for the stock.

The reasoning of the foregoing cases is helpful in deciding the case at hand. The seller here claims that there was a present sale of the shares of stock at the time the agreement was executed and that thereafter the shares belonged to the buyers. While the language of the agreement is cast in the present tense: "Seller hereby sells, assigns and delivers to Buyers [the stock in question] * * *" and "Said 45,500 shares of stock of the Corporation are herewith redelivered to the seller and reassigned by Buyers to Seller as collateral security * * *," the evidence otherwise indicates that there was no intention to make a present transfer of ownership of the stock. Although the agreement is worded in terms of a present sale, 6 days after the date of the agreement, on August 4, 1950, the seller executed an assignment and transfer of the shares in question, which read in part: "For Value Received, I hereby sell, assign and transfer unto Frank M. Nowatzki and Raymond S. Miller 45,500 shares of stock of Tiny Tot Safety Table Company, * * *." If ownership of the

shares was intended to be passed to the buyers upon execution of the agreement of sale, then we fail to see the need or purpose of this later assignment. Certainly it was, by its terms, more than a mere notification to the corporation to change the record ownership of the shares.

Furthermore, the minutes of the special meeting of the corporation's board of directors, held shortly after the agreement was executed, show that the parties to the agreement thought it necessary to obtain the board of directors' consent to the sale, because the agreement proposed to limit the authority of the officers of the corporation and to obligate the corporation in certain respects. To us this indicates that the parties did not consider the transaction consummated at the time the agreement of sale was executed. The resolution adopted at the special meeting lends further support to this interpretation. It states in part: "WHEREAS, Clarence W. Miller *owns* and *controls* 45,500 of the 46,700 issued and outstanding shares of the corporation and *has agreed to sell* said shares * * *." (Emphasis supplied.) The resolution then goes on to authorize the president and secretary of the corporation to enter into and execute the agreement of sale. The minutes of the meeting were approved by the seller, petitioner C. W. Miller, among others.

Finally, paragraph 4 of the agreement itself states that something more than the mere execution of the agreement was to be done before the agreement would become effective. It provides that as a condition precedent to the agreement's becoming effective, the seller and the corporation were to furnish the buyers with a certified balance sheet of the business as of July 31, 1950. The evidence does not disclose when, if at all, the mentioned balance sheet was furnished.

The inference we draw from the circumstances of the agreement that we have dwelt upon is that it was not the intention of the parties that ownership of the stock in question should pass upon execution of the agreement and that beneficial ownership was not in the buyers when the dividend was declared. In our view these circumstances point up the difference between this case and *Moore* v. *Commissioner*, *supra*. One ground for the court's decision in *Moore*, as we have pointed out, was that at the time the dividend was declared, the stock being sold was completely beyond the seller's control and nothing further remained for her to do to divest herself of title to the shares. Here it is apparent that such was not the case; here the seller himself made a formal assignment of the shares to the buyers 6 days after the agreement was executed and the dividend declared. The most plausible inference to be drawn from this, we think, is that the seller had ownership and control of the shares when the dividend was declared; this being so, the dividend that was declared payable to him

(as record owner of the shares on July 28, 1950) and that was actually paid to him, should properly be included in his income in the year received.

The fact that the parties in one part of their agreement included the dividend as part of the purchase price of the shares does not necessarily alter the tax consequences of its payment. In another part of the agreement it was provided that the dividend in question was to be paid to the seller and was to "apply on or reduce said sale price [of the stock] in such amount." This, we think, is the essence of the transaction: The corporation had a substantial earned surplus accumulation at the time; such surplus was available to the then stockholder (the seller); a dividend from the surplus was declared on the same day that the agreement to sell was entered into and while the seller was still in control of the corporation; this dividend was specifically made payable to stockholders of record the day before the date of the agreement (again, the seller); and the dividend was so paid, and according to the agreement, the amount of the dividend reduced the sale price of the stock. On these facts, the dividend was the seller's and was properly taxable to him. Cf. *T. J. Coffey, Jr.*, 14 T. C. 1410; *Merrill C. Gilmore*, 25 T. C. 1321.

In addition to what has been said above in distinguishing the case before us from those relied on by the seller, we point out that those cases involved situations where the stock sold was either placed in escrow or held as collateral by the seller until the purchase price, part of which was to be paid from dividends *subsequently* declared and at a time when the purchaser was in control of the stock, was paid. The dividends subsequently paid were held taxable to the purchaser. Here the dividend was declared on the same day as the sales agreement, made payable to the person who owned the shares on the day prior to the date of the agreement. The two situations call for different tax consequences.

Turning now to the second problem involved in Docket No. 55150, as fully explained in our Findings of Fact, respondent in his notice of deficiency to petitioners C. W. and Emma S. Miller disallowed the $1,000 standard deduction from adjusted gross income in arriving at net income for 1950. The basis for this action is that the deductions (unreimbursed automobile expenses and interest on a loan) taken by petitioners from gross income in arriving at adjusted gross income were in petitioners' case not properly business expense deductions but were deductible only from adjusted gross income in arriving at net income. We can not be certain from the evidence whether the unreimbursed portion of the automobile expenses claimed by petitioners were incurred by C. W. Miller as an employee or in carrying on a trade or business. If the former, they are not deductible from gross income because not shown to have been "expenses of travel * * * while away

from home." Secs. 23 (a) (1) (A) and 22 (n) (2), I. R. C. 1939. If the latter, they are not deductible because we are uninformed as to any trade or business that such expenses might have been incurred in. Sec. 23 (a) (1) (A). The interest paid on a bank loan made to buy shares of stock in Tiny Tot Safety Table Company was not shown to have been an ordinary or necessary expense of the taxpayers in carrying on any trade or business and is therefore not deductible from gross income in computing adjusted gross income. Secs. 22 (n) (1) and 23 (a) (1) (A), I. R. C. 1939.

It does not follow from these disallowances, however, that petitioners C. W. and Emma S. Miller should be denied the standard deduction from adjusted gross income in arriving at net income. To be entitled to the standard deduction it need only be elected on the return in the manner prescribed by the Commissioner with the approval of the Secretary of the Treasury. Sec. 23 (aa) (3.) (A), I. R. C. 1939; Regs. 111, sec. 29.23 (aa)–1 (b). This was done by petitioners. We fail to appreciate what bearing improperly taking deductions from gross income in arriving at adjusted gross income has on a taxpayer's election to take the standard deduction from adjusted gross income, even though the improperly taken deductions were deductions that could have been taken from adjusted gross income in computing net income if the taxpayer had itemized the latter group of deductions. There is no apparent inconsistency so far as petitioner is concerned in his attempt to claim the items as business expenses, which it has not been shown they were, and also electing to take the standard deduction. A proper result can be reached here by disallowing the deductions improperly made from gross income and by allowing petitioners to take the properly elected standard deduction.

Petitioners C. W. and Emma S. Miller have conceded their liability for penalties under sections 294 (d) (1) (A) and (d) (2) if the dividend in question is held to be includible in their gross income.

*In Docket Nos. 55351 and 55352 decisions will be entered for the petitioners.*

*In Docket No. 55150 decision will be entered under Rule 50.*