UNIROYAL INCORPORATED AND CONSOLIDATED SUBSIDIARIES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Uniroyal, Inc. v. Commissioner
Docket No. 46733-86
United States Tax Court
T.C. Memo 1993-214; 1993 Tax Ct. Memo LEXIS 207; 65 T.C.M. (CCH) 2690; May 18, 1993, Filed *207 U and I, corporations, each held 50 percent of the stock of R. U and I deadlocked over R's future operations. After extensive negotiations, U and I agreed in general that (1) R would be split into two companies -- R (which would be owned solely by I) and R2 (which would be owned equally by U and I) -- and (2) U would receive a total of $ 31 million in cash. However, no binding agreement was entered into, and U and I continued to negotiate. On or about Dec. 28, 1981, R created R2 as its wholly owned subsidiary. On Dec. 31, 1981, R transferred $ 16.5 million in cash to U and a $ 16.5 million promissory note to I. Also on Dec. 31, 1981, R transferred the stock of R2 to U and I equally. On Jan. 5, 1982, U and I made a binding agreement that I would pay to U $ 13.7 million in exchange for U's stock in R. On Jan. 15, 1982, I paid the $ 13.7 million to U and transferred the stock. I also assumed an $ 800,000 liability from R2 to U. (R had been the obligor, but R2 became the obligor on or after Dec. 28, 1981.) The total of these items and the $ 16.5 million cash transfer to I approximated $ 31 million. Held: The Dec. 31, 1981, transfer by R of $ 16.5 million in cash to U was *208 a distribution of a dividend to U, eligible for the 85-percent deduction for dividends received by a corporation. Sec. 243, I.R.C. 1954. For petitioners: Philip S. Winterer, Joseph P. Moodhe, and Gary M. Friedman. For respondent: Stephen C. Best and Robert E. Marum. CHABOT
CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined a deficiency in Federal corporate income tax against petitioners [1] for 1982 [2] in the amount of $ 1,320,450. After a concession by respondent, see infra note 14, the issue for decision is whether a $ 16,500,000 cash transfer [3] to Uniroyal by a 50-percent subsidiary is to be taxed to Uniroyal as a *209 dividend or as part of the sale price of Uniroyal's stock in the subsidiary. FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition was filed in the instant case, Uniroyal's principal office was at Middlebury, Connecticut. Rubicon Chemicals, Inc.
Uniroyal was a co-owner of Rubicon Chemicals, Inc. (hereinafter sometimes referred to as Rubicon), a corporation organized in 1963 under Louisiana law. *210 Rubicon's outstanding stock consisted of 2,500,000 class A shares and 2,500,000 class B shares. The class A and class B shares were identical, except with respect to voting rights for Rubicon's directors. Uniroyal owned all of Rubicon's class A shares. Rubicon's other owner was Imperial Chemical Industries, PLC (hereinafter sometimes referred to as Imperial), which owned all of the class B shares. [4] Imperial is a corporation organized under United Kingdom law. Imperial also owned all the stock of ICI, a corporation organized under Delaware law. ICI is merely a holding company. Another related company, ICI Americas, Inc. (hereinafter sometimes referred to as ICI Americas), was a wholly owned *211 subsidiary of ICI. Rubicon manufactured chemicals. Rubicon had two separate lines of business. One line involved the production of diphenylamine (hereinafter sometimes referred to as DPA) and aniline. Aniline and DPA were key raw materials used in Uniroyal's rubber chemical business. Rubicon was the main supplier of these products to Uniroyal. The basic arrangement was that Rubicon leased its aniline and DPA facilities to Uniroyal and Imperial, and manufactured the aniline and DPA for their benefit, for cost ($ 16,752,000 for 1980, $ 21,409,000 for 1981) plus a set fee of $ 600,000 per year. Uniroyal took all of Rubicon's DPA production and about 25-30 percent of Rubicon's aniline production; Imperial or its subsidiaries took the remainder of Rubicon's aniline production. Rubicon did not sell any DPA or aniline in the open market. Rubicon's other chemical products line consisted of two isocyanate compounds, tolylene diisocyanate (hereinafter sometimes referred to as TDI) and diphenylmethane diisocyanate (hereinafter sometimes referred to as MDI). Uniroyal had less of a strategic interest in Rubicon's production of isocyanates than it had in aniline and DPA. Imperial, however, *212 regarded MDI and TDI production as an important part of its worldwide business operations. Isocyanate compounds are used in many consumer and industrial products, including automobile products, construction materials, appliances, mattresses, and furniture cushions. About 80 percent of Rubicon's isocyanate production was sold in the open market, with the remaining 20 percent being available to its shareholders. Because Rubicon received only $ 600,000 profit per year from its aniline and DPA production, most of Rubicon's total profits came from the sale of isocyanates. The following table shows Rubicon's income and retained earnings for 1980 and 1981. 1980 [1]
1981 [2]
Income before income taxes
$ 16,167,000
$ 19,412,000
Net income
9,545,000
10,464,000
Retained earnings
19,733,000
30,197,000
(end of year)
Despite these profits, Rubicon had never paid any dividends to either shareholder, *213 Uniroyal or Imperial. However, Rubicon paid royalties to Imperial on the sales of MDI, in the amounts of $ 1,568,000 for 1980 and $ 2,299,000 for 1981. Proposals To Separate Uniroyal From Rubicon's Isocyanate Business
In 1979 and 1980, worldwide demand for isocyanates was strong. Imperial believed that the demand for isocyanates, particularly for MDI, would be further stimulated by rising energy prices. Furthermore, at that time only a handful of companies in the world produced MDI. Thus, in 1979 Imperial began to consider expanding Rubicon's isocyanate business. By early 1981, Imperial proposed that Rubicon expand its isocyanate production at the immediate cost of about $ 92 million, to be followed by a second, similar expansion in 1986. Uniroyal was not willing to pay half the cost of the proposed expansion of Rubicon's isocyanate business. During 1980 and 1981, Uniroyal was emerging from a period of severe financial distress. During this time, Uniroyal placed a high priority on improving its balance sheet. In particular, Uniroyal sought to repay certain of its outstanding debts and to generate cash to fund its core businesses. Accordingly, Uniroyal was unwilling *214 to share the cost of Rubicon's isocyanate expansion both for financial reasons and because Uniroyal was less interested in isocyanates than in aniline and DPA. Because Uniroyal and Imperial were equal co-owners of Rubicon, no major proposal affecting Rubicon could be carried out without the approval of each shareholder. Thus, consideration of the expansion proposal was at a deadlock. Since Uniroyal's main interest in Rubicon was the production of aniline and DPA, and Imperial was primarily concerned with Rubicon's isocyanate business, a possible solution to the deadlock was to split Rubicon into two separate entities, one to produce DPA and aniline, and the other to produce isocyanates. By early 1981, Uniroyal and Imperial began to discuss the possible transfer of Uniroyal's interests in Rubicon's MDI and TDI facilities. On June 25, 1981, Imperial's board of directors approved a proposal for ICI Americas to proceed towards acquiring Uniroyal's 50-percent interest in Rubicon for not more than $ 39 million ($ 31 million cash plus assumption of $ 8 million debt). Imperial's negotiators considered three alternative methods of acquiring Uniroyal's share of the isocyanate business, *215 as follows: (1) Buy-out of Uniroyal's 50% share of stock in Rubicon. This is essentially the mechanism presented to the [Imperial] Main Board on June 25, 1981. (2) A Uniroyal proposal * * * based on the concept of full leasing of the Rubicon assets. This would involve the establishment of Rubicon as a leasing company with 100% rights to [Imperial] for isocyanates, 100% rights to Uniroyal for DPA, and aniline rights as currently exist, etc. (3) A two-company concept formulated during preliminary discussions within [Imperial] which would place the isocyanates and offsites into a 100% [Imperial] company (R2) and leave the residual DPA and aniline assets in a jointly held company (R1) as per the current arrangement.
It was recognized that Uniroyal would want assurances about its DPA and aniline source of supply. This concern caused Uniroyal to balk at Imperial's proposal to buy Uniroyal's Rubicon stock. Negotiators then moved to the third of the above-listed methods. Imperial's negotiators then asked Imperial's board of directors to approve the following proposal: Rubicon would be reorganized into two companies. One company would comprise the MDI and TDI assets and *216 business. The other company would continue to manufacture aniline and DPA under a lease arrangement and would continue to be owned equally by Uniroyal and Imperial. Uniroyal would sell to Imperial Uniroyal's 50-percent interest in Rubicon's isocyanate business for $ 30 million. This price, which Imperial had considered offering for 50 percent of the entire then-present Rubicon, could properly be offered for 50 percent of the stripped-down Rubicon because of significantly improved projections as to the MDI and TDI markets. The negotiators understood that, in order to minimize tax liabilities, "some initial payments must be made before January 6, 1982 and transaction completed prior to January 27, 1982." [5]
On July 9, 1981, the president of Uniroyal Chemical *217 Co., a division of Uniroyal, sent a memorandum to Uniroyal's board of directors, including the following language: Approval is requested to divest the MDI/TDI Assets of the Rubicon joint venture at Geismar, Louisiana. We will sell our interests in all urethane operations, MDI and TDI, to our joint venture partner, [Imperial]. Our share of the assets will be sold and [Imperial] will assume the guarantee of our share of the outstanding debt of Rubicon (approximately $ 25M in total) for a net price of $ 31M. Uniroyal will retain its interests at Rubicon to produce Aniline and DPA in support of our rubber chemical and other specialty chemical businesses. * * * In recognition of the above and after considerable negotiation, [Imperial] has agreed to pay Uniroyal $ 31M (or some $ 15M in excess of Dec. 31, 1981 equity value) and will assume the outstanding loan obligation (currently guaranteed by Uniroyal, Inc.) of $ 12.5M for its 50% share of the assets associated with MDI/TDI. We respectfully request approval to proceed with this divestment for $ 31M with the form of the transaction to be finalized. [Emphasis added.]
On July 15, 1981, Uniroyal's board of directors *218 approved the transfer of Uniroyal's share of the isocyanate business to Imperial, at a price and on terms approved by Uniroyal's president and chief executive officer. Still in July, Uniroyal proposed to Imperial a different method of rearranging their interests in Rubicon. Under this proposal, Rubicon would lease its MDI and TDI plants to ICI Americas, and operate those plants for a fee. Rubicon would distribute to its shareholders an amount equal to their equity in Rubicon related to the production and sale of MDI and TDI. The distribution would be in the form of cash to Uniroyal and a note or cash to Imperial. A third class of stock (nonvoting common) would be issued in equal amounts to Uniroyal and Imperial, and Uniroyal would sell its half of this new stock to Imperial for $ 31 million less the above-mentioned cash distribution to Uniroyal. At a meeting of Uniroyal and Imperial negotiators on October 13, 1981, Uniroyal's negotiators indicated that Imperial's two-corporation split-off proposal was not practical and very complex. Imperial's negotiators indicated that Uniroyal's lease approach would not sufficiently protect Imperial's interest in the isocyanate production, *219 and other aspects of Uniroyal's proposal probably would be viewed by respondent as a sale. Imperial's negotiators then proposed a detailed version of a two-corporation spin-off which they said appeared to meet Uniroyal's requirements. The negotiators then discussed the tax consequences of the proposals. Uniroyal's negotiators were basically receptive to Imperial's proposals. The negotiating teams agreed that further consideration was necessary. Among other matters, Imperial's tax manager was to present to Uniroyal's tax manager the following: (i) a detailed explanation of the [Imperial] view of the tax exposure in the lease arrangement; (ii) the mechanics of the spinoff proposal and a qualitative analysis of its tax position.
On November 20, 1981, Uniroyal's counsel wrote to ICI Americas' counsel as follows: This will confirm that we will meet on * * * November 24th, * * * to move along some of the detail work which will have to be completed by [Imperial] and Uniroyal now that the "working groups" have agreed to the basic elements of the Rubicon restructuring that are set out below. Obviously my understanding as to such agreement is subject to the final review *220 and approval by management. * * * My understanding of the conceptual framework of the restructuring is as follows: The restructuring of Rubicon will be accomplished by the dividend route and the subsequent sale of Uniroyal's stock in Rubicon to [Imperial]. * * * Rubicon's board will declare and pay a dividend in 1981 (presumably close to December 31st) of all of Rubicon's tax earnings and profits currently estimated to be about $ 37 million, of which $ 18.5 million will be paid in cash to Uniroyal and $ 18.5 million will be paid to [Imperial] in the form of a promissory note. Rubicon will finance the cash dividend as required through the sale of receivables to a third party not affiliated with [Imperial]. Rubicon will also dividend out its stock in R-2 to Uniroyal and [Imperial] the effect of which will be to reduce the tax basis of Rubicon's stock in the hands of Uniroyal and [Imperial] to the extent of the perceived value of the R-2 stock. (The valuation issue will be affected by the fact that the assets of R-2 will be held subject to the Leases and the Operating Agreement, thereby limiting the ability of R-2 to exploit those assets, and by the liabilities assumed by R-2. *221 Presumably the perceived value will be relatively nominal). The subsequent sale of Uniroyal's stock in Rubicon to [Imperial] will occur in 1982 for $ 12.5 million in cash. The restructuring will not be permitted under Rubicon's Credit Agreement with its banks and Rubicon will have to consider first retiring all bank debt or refinancing such debt in a manner permitting the transaction to proceed. Currently Uniroyal's tax department does not intend to seek any IRS ruling on the transaction. Uniroyal intends to seek review of Rubicon's 1981 tax return even though prepared and filed after the completion of the restructuring. As a point of timing and mechanics, I envision that all of the agreements including appropriate amendments to existing agreements will be executed at the time the Rubicon board declares the dividend, thus permitting the parties to fix the price to be paid for Uniroyal's Rubicon stock in a separate stock purchase agreement.
Imperial's tax department prepared a table dated November 27, 1981, showing different acquisition scenarios whereby Imperial would acquire Uniroyal's stock interest in Rubicon's isocyanate assets. Under each of the scenarios, which includes *222 a straight stock purchase, a limited cash dividend ($ 9.5 million cash to Uniroyal), and a full cash dividend ($ 18.5 million cash to Uniroyal), the net consideration to be paid by Imperial totals $ 31 million. A memorandum from a London, England, office of the Continental Illinois National Bank and Trust Company of Chicago (hereinafter sometimes referred to as Continental Illinois), [6] dated December 14, 1981, sets forth five stages for the restructuring of Rubicon, as follows: 1)
Current ownership of Rubicon
[Imperial]
- 50%
Uniroyal Inc.
- 50%
2)
On 21 December 1981 ownership to be changed to
ICI American Holdings Inc.
- 50%
Uniroyal Inc.
- 50%
3)
Leased and operating assets split off on 22 December
1981 into a 100% owned subsidiary of Rubicon (R2).
4)
Ownership of R2 transferred on 31 December 1981 as a
dividend from Rubicon to
ICI American Holdings Inc.
- 50%
Uniroyal Inc. - 50%
5)
On 15 January 1982 ICI American Holdings purchases
Uniroyal's shareholding in Rubicon.
The key dates are that stage (4) must be completed on or before 6 January 1982 and stage (5) between 6 January 1982 and 27 January 1982. The consideration *223 that [Imperial] is paying to Uniroyal is (a) an $ 18 million dividend on the Class 'A' shares (owned solely by Uniroyal) and (b) $ 12 million in cash. The purpose of having as much of the payment constructed as a dividend is to minimize the tax payable by Uniroyal (dividends attracting a 15% tax rate). In order to obtain the bank's waiver of certain covenants in the credit agreement, (particularly the covenant relating to dividends), [Imperial] is prepared to share the economic benefit with them. The benefit to [Imperial] comes from their agreement with Uniroyal under which the consideration that [Imperial] has to pay is reduced the more the payment is made by way of a dividend rather than by cash. * * * [Emphasis added.]
*224 Creation of Rubicon, Inc.
On or about December 28, 1981, Rubicon organized a new corporation called Rubicon, Inc. (hereinafter sometimes referred to as R2), as a wholly owned subsidiary. On December 28, 1981, Rubicon transferred its aniline and DPA assets and liabilities to R2. In return, on December 31, 1981, Rubicon received all 400,000 shares of class A common stock and all 400,000 shares of class B common stock in R2. Interim Shareholders Agreement
As of December 29, 1981, [7]Uniroyal and Imperial entered into an Interim Shareholders Agreement, which includes the following items: (1) As of December 28, 1981, (a) Rubicon is to transfer to R2 its aniline and DPA assets and liabilities and (b) R2 is to transfer to Rubicon 400,000 shares of Class A stock and 400,000 shares of Class B stock. (2) Not later than December 31, 1981, Rubicon is to distribute (a) all of the Class A R2 stock to Uniroyal and all of the Class B R2 stock to Imperial, and (b) $ 16.5 million "in immediately available funds" each to Uniroyal and Imperial, except that Rubicon's distribution to Imperial is to be in the form of an interest-bearing promissory note. (3) After these transfers, *225 on January 15, 1982, Imperial is to lend $ 800,000 to R2. This is about equal to the unpaid balance (as of December 27, 1981) of a loan from Uniroyal to Rubicon with respect to Uniroyal's share of responsibility for certain Rubicon assets that relate to MDI and TDI operations. R2 is then to promptly repay that amount to Uniroyal. (4) At a closing on January 15, 1982, Uniroyal is to sell, and Imperial is to buy, Uniroyal's stock in Rubicon, for $ 13.7 million. Imperial is to assume Uniroyal's obligations and liabilities under a guaranty given pursuant to a June 1, 1978, credit agreement [discussed infra].
Bank Transactions
The Credit Agreement provides that the two banks will make revolving credit loans in *226 the amounts of $ 15 million (from Chemical Bank) and $ 10 million (from Continental Illinois) available to Rubicon. As of December 28, 1981, Rubicon had reached its credit limit of $ 25 million under the Credit Agreement. Uniroyal and Imperial, as Rubicon's two shareholders, each executed a guaranty with respect to the Credit Agreement. [8] The Credit Agreement contains certain negative covenants restricting capital distributions by Rubicon, among other things. However, on December 22, 1981, Continental Illinois and Chemical Bank notified Rubicon, Imperial, and Uniroyal that the two banks were waiving various sections of the Credit Agreement to permit the corporate restructuring of Rubicon. As of December 28, 1981, Rubicon's board of directors authorized Rubicon to borrow $ 15 million ($ 9 million from Chemical Bank and $ 6 million from Continental Illinois) "to meet current working capital needs." This resolution is reported in the board of directors minutes immediately after the dividend resolutions ($ 16.5 million and 400,000 shares of R2 stock to each Rubicon shareholder). *227 A telex dated December 29, 1981, from the London office of Continental Illinois to its Chicago office, states that a $ 6 million transaction credit to Rubicon for 30 days from December 31, 1981, had been approved. The purpose of the transaction credit was to assist with the corporate restructuring of Rubicon under which Imperial would become the 100-percent owner. The telex contains the following: Repayment of the loan will come from funds that [Imperial] is making available today to ICI Americas to payout Uniroyal and to repay this transaction credit (and a similar dols 9 million credit for Chemical Bank) * * *
The $ 6 million transaction credit from Continental Illinois to Rubicon was effective on December 31, 1981, and expired on January 29, 1982. Continental Bank's credit reporting form shows Rubicon as the only obligor on the $ 6 million loan and shows that there was no collateral on this loan. A second loan of $ 9 million was advanced from Chemical Bank to Rubicon, effective on December 31, 1981, with a maturity date of January 4, 1982. As of late December 1981, Rubicon (after having transferred its aniline and DPA assets to R2) could have borrowed at least $ *228 20 million from third-party lenders on the strength of its credit alone. This $ 20 million would be in addition to any preexisting borrowings of Rubicon. Rubicon could then have distributed to its shareholders, without legal or other restrictions, the $ 20 million, along with the $ 5 million in cash that Rubicon held at the time. [9]
December 31, 1981, Transfers to Imperial and Uniroyal
On December 31, 1981, Rubicon transferred to Uniroyal $ 16.5 million cash, and to Imperial a $ 16.5 million 30-day interest-bearing (11 percent per year) promissory note dated December 28, 1981. [10]
On its tax return, Imperial (actually *229 Imperial's American Subsidiary, ICI; see supra note 4) treated the promissory note as a dividend. On January 29, 1982, Rubicon replaced the December 28, 1981, promissory note to Imperial with a new note for $ 16.5 million, calling for payments of principal in five equal annual installments of $ 3.3 million beginning on January 29, 1988, and monthly interest payments on the unpaid principal amount at the rate of 13 percent per year, beginning immediately. The earnings and profits of Rubicon as of the close of its taxable year ended December 26, 1982, were sufficient to cover in full the transfer made to Uniroyal on December 31, 1981. See infra note 14. Also on December 31, 1981, Rubicon transferred to Uniroyal and Imperial all of the stock of R2 in equal amounts. Uniroyal received 400,000 class A shares and Imperial received 400,000 class B shares, respectively, of R2. (See infra note 14, for tax treatment of this item.) Sale of Uniroyal's Rubicon Shares to Imperial
A stock sales agreement, dated January 5, 1982, provides that Uniroyal will sell its class A shares in Rubicon to Imperial on January 15, 1982, for $ 13.7 million. This agreement may have been *230 signed before January 5, 1982, but in any event it was signed after December 31, 1981. On January 15, 1982, the actual transfer of money and stock occurred as planned, and Imperial became the sole owner of Rubicon. As part of the transaction, Imperial bought certain properties from Rubicon by assuming an $ 800,000 liability from Rubicon to R2. This $ 800,000 item, Imperial understood, "was included as part of [the] $ 31 million purchase price." By the end of November 1981, there was an agreement between Uniroyal and Imperial that Imperial would pay $ 31 million for Uniroyal's interest in Rubicon's isocyanate business, but that this obligation would be reduced by the cash transfer that Rubicon would make to Uniroyal. On December 31, 1981, there was no binding agreement for the sale of Uniroyal's stock in Rubicon, and Uniroyal was the legal and beneficial owner of the stock. After the December 31, 1981, transfers, Rubicon had $ 16.5 million less cash than before and had also incurred a $ 16.5 million obligation to Imperial. The primary purpose of the transactions was to meet Uniroyal's and Imperial's business needs of (1) separating Uniroyal from Rubicon's isocyanate business *231 and (2) continuing Uniroyal's and Imperial's joint ownership of Rubicon's aniline and DPA business. The choice of forms to accomplish this purpose was substantially affected by Uniroyal's view of its tax liabilities under different scenarios. OPINION Petitioners contend that the $ 16.5 million cash transferred by Rubicon to Uniroyal on December 31, 1981, is properly treated as a dividend [11] *232 to Uniroyal, eligible for the 85-percent dividends received deduction under section 243. [12] Petitioners contend that the instant case is controlled by Litton Industries, Inc. v. Commissioner, 89 T.C. 1086 (1987). Respondent contends that the $ 16.5 million transfer is in substance part of the proceeds from Uniroyal's sale of its Rubicon stock to Imperial for $ 31 million, and thus is taxable as a capital gain under section 1201. [13] Respondent invokes "form over substance" and contends *233 that under the step transaction doctrine, the dividend and sale should be treated as a single transaction which was a sale of Uniroyal's Rubicon stock. Respondent contends that the instant case is controlled by Waterman Steamship Corp. v. Commissioner, 430 F.2d 1185 (5th Cir. 1970), revg. 50 T.C. 650 (1968). Neither side contends that the transactions should be treated in whole or in part as a redemption, with section 302 providing the rule for dividend or capital gain treatment. See, e.g., Estate of Schneider v. Commissioner, 855 F.2d 435 (7th Cir. 1988), affg. 88 T.C. 906 (1987); Zenz v. Quinlivan, 213 F.2d 914 (6th Cir. 1954). We agree with petitioners that the transfer to Uniroyal is a dividend to Uniroyal. [14]
*234 Background
In general, the "incidence of taxation depends upon the substance of a transaction" rather than its mere form. E.g., Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945). A taxpayer has the right to minimize taxes as far as the law allows, United States v. Cumberland Pub. Serv. Co., 338 U.S. 451, 455 (1950); Gregory v. Helvering, 293 U.S. 465, 469 (1935); United States v. Isham, 84 U.S. (17 Wall.) 496, 506 (1873); however, the taxpayer ordinarily may not, through form alone, achieve tax advantages which substantively are without the intent of the statute, Commissioner v. Court Holding Co., supra; Gregory v. Helvering, supra.Nevertheless, in the area of stock sales and dividends there are many factual variations, and often slight differences in formal procedure lead to substantial tax differences, even though there are small (if any) economic differences. In this area, it is often difficult to identify the "substance" that is supposed to control over the "form". *235 See, e.g., Monson v. Commissioner, 79 T.C. 827, 844-845 (1982); see also comment by L. Hand, J., in Commissioner v. Sansome, 60 F.2d 931, 933 (2d Cir. 1932), revg. 22 B.T.A. 1171 (1931). The proper tax treatment of a corporate transfer to a shareholder, closely followed (or, in some cases, preceded) by that shareholder's sale of stock has been the subject of many opinions by this Court and by other courts, not all of them consistent. [15] Additionally, the courts have used a variety of analyses to decide whether a transfer is properly taxable as a dividend or as a part of the sale price. The law in this area is further complicated by the fact that tax treatment may also differ depending on whether the shareholder is an individual or a corporation, or even whether the transferor is a foreign corporation or a domestic corporation. If the shareholder is an individual, then a dividend to the shareholder generally is taxable as ordinary income, whereas if the transfer is characterized as part of the sale price for stock, then the gain may be taxable at a lower effective rate as capital gain, *236 and the amount of gain offset by the stock basis. If the shareholder is a corporation, then a dividend is generally eligible for the section 243 dividends received deduction (or if the corporations file consolidated returns, then the corporation receiving the dividend may eliminate it entirely from income), whereas if the transfer is characterized as part of the sale price, then the gain may be taxable at a greater effective rate as a capital gain. A related issue in this context is whether a transfer which is properly a dividend is a dividend to the seller or a dividend to the buyer. *237 A final preliminary matter: both Litton Industries, Inc. v. Commissioner, 89 T.C. 1086 (1987), and Waterman Steamship Corp. v. Commissioner, 430 F.2d 1185 (5th Cir. 1970), revg. 50 T.C. 650 (1968), are factually distinguishable from the instant case in many aspects. The instant case differs from both Waterman Steamship and Litton Industries in that (a) in those two cases the seller controlled the subsidiary while (b) in the instant case the seller, Uniroyal, could not cause Rubicon to transfer any amount unless the buyer, Imperial, agreed. These and other points of distinction are elaborated in the following pages of this opinion. The instant case differs from Litton Industries in that (a) in Litton Industries the dividend was paid to the parent about 8 months before the eventual buyer made an offer for the subsidiary while (b) in the instant case the dividend was not paid until the sale negotiations were almost completed. Accordingly, we reject each side's contentions that Litton Industries (for petitioners) or Waterman Steamship (for respondent) controls the instant *238 case. Analysis
The form of the transfer here in dispute was that of a dividend to Uniroyal. [16] In the instant case we must enquire further, in order to determine how the transfer is to be taxed. See Litton Industries, Inc. v. Commissioner, 89 T.C. at 1099. The parties have locked horns on the question of whether the transfer of $ 16.5 million from Rubicon to Uniroyal may be disregarded as a separate transaction under the step transaction doctrine. In Esmark, Inc. & Affiliated Cos. v. Commissioner, 90 T.C. 171, 195 (1988), affd. without published opinion 886 F.2d 1318 (7th Cir. 1989), *239 this Court described the step transaction doctrine as follows: We recently described the step-transaction doctrine as another rule of substance over form that "treats a series of formally separate 'steps' as a single transaction if such steps are in substance integrated, interdependent, and focused toward a particular result." Penrod v. Commissioner, 88 T.C. 1415, 1428 (1987). * * * * * * The existence of an overall plan does not alone, however, justify application of the step-transaction doctrine. Whether invoked as a result of the "binding commitment," "interdependence," or "end result" tests, the doctrine combines a series of individually meaningless steps into a single transaction. * * *
In Penrod v. Commissioner, 88 T.C. 1415, 1428 (1987), after explaining the step transaction doctrine as in the quotation from Esmark, this Court discussed the different tests which have been applied: The "binding commitment" test, the "end result" test, and the "interdependence" test. Id. at 1428-1430. In Walt Disney Inc. v. Commissioner, 97 T.C. 221, 232 (1991), *240 we stated that "However invoked, the step transaction doctrine combines individually meaningless steps into a single transaction." The following elements cause us to conclude on balance that the transfer was not a meaningless step in a step transaction situation, and should be taxed as a dividend to Uniroyal. Firstly, as respondent points out, Imperial faced substantial additional costs (which respondent describes on brief as "an additional $ 1.2 million dividend tax and a $ 2.0 million refinancing cost") in order to accommodate Uniroyal's preference for a dividend from Rubicon. Thus the dividend form had real-world consequences to others besides petitioners and the Federal fisc. These real-world consequences were bargained out with Imperial, whose interests in this matter conflicted with Uniroyal's interests. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 738-739 (1973). These real-world consequences of the dividend distribution form weigh in favor of a conclusion that the $ 16.5 million transfer in the form of a dividend distribution from Rubicon to Uniroyal was real and was not a meaningless step. Secondly, the matter of Rubicon's financial *241 status, and where the funds for the transfers came from, is more complicated than the question of whether the claimed dividend had real-world nontax consequences. Rubicon had less cash and more debts -- aggregating $ 33 million -- after the December 31, 1981, transfers. Rubicon could borrow the necessary funds from the banks on its own credit. Rubicon treated the note to Imperial as a true debt (so respondent's witness testified). However we must factor in two other elements, as follows: (1) The reason for the Uniroyal-Imperial dispute and (2) the fungibility of money. Imperial wanted to expand Rubicon's isocyanate production and had called for an infusion of about $ 92 million into Rubicon in 1981 and a similar expansion in 1986. Imperial's acquisition of Rubicon's isocyanate capabilities was tied to Imperial's intention to put substantial amounts into Rubicon. If Rubicon was $ 33 million poorer as a result of the December 31, 1981, transfers, then Imperial would have to put about that much more into Rubicon in order to get Rubicon into the condition that Imperial's planners envisioned for Rubicon. Given the general fungibility of money, one may argue that this differs little *242 from the economics that caused the Court of Appeals to hold in Waterman Steamship Corp. v. Commissioner, supra, that the subsidiary was merely a conduit for the buyer. The Court of Appeals there held that there was no dividend to the seller. [17] On the other hand, in Litton Industries, Inc. v. Commissioner, 89 T.C. 1086 (1987), the dividend was paid by the subsidiary in the form of a promissory note; when the subsidiary's stock was sold, the buyer bought the promissory note at face value. Thus, it could be contended that, in Litton Indutries also, the funds to pay the dividend came from the buyer. This aspect of the instant case is not an element that inclines us one way or the other as to whether the transfer was a meaningful step. *243 Thirdly, the parties to the December 31, 1981, transfers committed themselves to the transfers, regardless of the outcome of the proposed sale of Uniroyal's stock in Rubicon. Uniroyal, as a 50-percent shareholder, did not have sole control over Rubicon. Uniroyal could not unilaterally control either the declaration of a dividend by Rubicon, or any subsequent events in the transaction. In fact, although Uniroyal and Imperial were each 50-percent shareholders of Rubicon, and had a common interest in accomplishing the sale of stock, the record reflects arm's-length negotiations for the sale of Uniroyal's Rubicon stock. Thus we conclude that Rubicon's shareholders had committed Rubicon to the transfers before the sale occurred, and that neither Uniroyal nor Imperial could have unilaterally changed that commitment if the sale had not occurred. This weighs in favor of a conclusion that the transfer was not a meaningless step. Fourthly, we conclude, and we have found, that there was no binding agreement for the sale of Uniroyal's stock at the time Rubicon declared a dividend and made the transfer to Uniroyal. Thus, Uniroyal was the legal and beneficial owner of the stock at the time *244 a dividend was declared and the transfer was made; we have so found. Respondent contends that the transfer and sale were contemporaneous. Respondent bases this assertion on the fact that the Agreement Respecting Sale of Shares is attached to the Interim Shareholders Agreement, see supra note 7. The Interim Shareholders Agreement states that it was "made as of the 29th day of December, 1981". The Agreement Respecting Sale of Shares states that it was made "as of the 5th day of January, 1982", but a signed copy is attached to the Interim Shareholders Agreement. However, respondent's witness James M. Carter, senior counsel for ICI Americas, testified that the transfer preceded the sale of shares by 1 or 2 days. We also conclude, and we have found, that Uniroyal was the beneficial owner of the stock until the agreement to sell the stock was signed. Robert Alvine, president of Uniroyal Development Co., a division of Uniroyal, testified that Uniroyal could have voted its shares between the time that the transfer was declared and the time that the sale took place. Nothing in the record indicates otherwise. We conclude, on the facts of record in the instant case, that the transfer *245 was not a meaningless transaction, that the transfer had independent significance, and that the step transaction doctrine should not be applied. Under these circumstances, we are left with the facts that Uniroyal, Imperial, and Rubicon created. We reject the notion that, if there are several ways to accomplish an economic transaction, then the taxpayer should be taxed as though it had selected the way that attracts the greatest tax liability. Compare, e.g., Palmer v. Commissioner, 62 T.C. 684, 693 (1974), affd. 523 F.2d 1308 (8th Cir. 1975), with Estate of Schneider v. Commissioner, 88 T.C. 906, 945 (1987), affd. 855 F.2d 435 (7th Cir. 1988). We conclude that, in the instant case, the form that was used fairly represents the substance of what was done. Because we have concluded that Rubicon paid a dividend when it transferred the $ 16.5 million cash to Uniroyal, and because we have concluded that Uniroyal was the legal and beneficial owner of Uniroyal's Rubicon stock when the dividend was declared and paid, the $ 16.5 million cash is a dividend to Uniroyal and not *246 to Imperial. To the concern that our approach may facilitate taxpayer manipulation and abuse, we make the following responses. Firstly, the Congress has established the general policy that corporate income should be taxed once at the corporate level, and then the remainder (i.e., the income less the corporate income tax) should be taxed again when it is distributed out of corporate solution. The intercorporate dividend exclusion is designed to keep corporate income from being taxed more times, and it has a consequence of delaying the imposition of the second tax. Our holding does not contravene this general policy. Rubicon's income was taxed. What we hold to be a dividend to Uniroyal increases Uniroyal's earnings and profits, setting the stage for the second tax to be imposed on Uniroyal's noncorporate shareholders. Secondly, the Congress reviews its policy from time to time. The 85-percent exclusion of the year in issue was reduced to 80 percent and is now a 70-percent exclusion, thereby increasing the multiplicity of taxation on corporate income. At the same time, the Congress has expanded the availability of subchapter S pass-through treatment, [18] reducing the multiplicity *247 of taxation on corporate income. For decades, the Congress and the Treasury Department have pondered ways of integrating taxation of corporations and their shareholders, so that corporate income would be taxed only once. (See the recent Report of the Department of the Treasury, "Integration of Individual and Corporate Tax Systems -- Taxing Business Income Once" (January, 1992), submitted in response to sec. 634 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2282). Thus, if the Congress wishes to revise its objectives, or change the "ground rules" to reduce abuse, then the Congress has both the power and the will to do so. Thirdly, it may well be maintained that our analysis is as likely as not to reduce the overall incidence of abuse. The Court of Appeals for the Fifth Circuit noted respondent's apparent "tendency to rely on 'substance' when beneficial to the revenues or to rely on 'form' when more beneficial to the revenues." Casner v. Commissioner, 450 F.2d 379, 398 (5th Cir. 1971), *248 affg. in part and revg. in part T.C. Memo. 1969-98. Rev. Rul. 75-493
Petitioners place much emphasis on Rev. Rul. 75-493, 1975-2 C.B. 108, which involves a presale distribution of cash to an individual shareholder. The ruling states that the distribution will be treated as a dividend to the seller because the distribution was made before there was a binding agreement to sell the stock for a fixed price. Petitioners contend that respondent should be estopped from urging a result different from that in respondent's ruling. First, we note that a revenue ruling merely represents respondent's position with respect to a certain set of facts, and does not constitute substantive authority for a position. See, e.g., Haley Bros. Construction Corp. v. Commissioner, 87 T.C. 498, 516-517 (1986), and cases cited therein. Second, because we have decided in petitioners' favor on the basis of the statutes and judicial decisions, we do not attempt to analyze or decide the effect, if any, of respondent's revenue ruling on the instant case. Conclusion
*249 We conclude that the transfer to Uniroyal is a dividend, eligible for the dividends received deduction under section 243. We hold for petitioners. To reflect the foregoing, and to take into account a concession by respondent, see supra note 14, Decision will be entered for petitioners. Footnotes
1. The "consolidated subsidiaries" of petitioner Uniroyal, Inc. (hereinafter sometimes referred to as Uniroyal), are certain related corporations that joined Uniroyal in filing a consolidated Federal income tax return for the year in issue. The dispute in the instant case relates to Uniroyal itself.↩
2. Uniroyal's 1982 taxable year ended on Jan. 3, 1982.↩
3. Both sides refer to the payment in question as a "distribution". Because of our concern that that term might be thought to beg the question before us of whether the payment in question is a "distribution" within the meaning of sec. 301, we have chosen to use the more neutral term, "transfer". Unless indicated otherwise, all section, subchapter, chapter, and subtitle references are to sections, subchapters, chapters, and subtitles of the Internal Revenue Code of 1954 as in effect for the year in issue.↩
4. Imperial owned all of Rubicon's class B shares until Dec. 29, 1981, when it transferred these shares to its wholly owned American subsidiary, ICI American Holdings, Inc. (hereinafter sometimes referred to as ICI). For the sake of simplicity in this opinion, we will refer to Imperial as Uniroyal's co-owner in Rubicon.↩
1. Rubicon's 1980 fiscal year ended on December 28.↩
2. Rubicon's 1981 fiscal year ended on December 27.↩
5. It is not clear from the record why the parties thought it necessary that the transactions be completed by these dates. Note that Uniroyal's taxable year ended Jan. 3, 1982 (supra↩ note 2). It may be that these dates were important for Imperial's purposes.
6. Continental Illinois, along with Chemical Bank, had made a revolving credit loan to Rubicon in 1978. (See discussion under Bank Transactions, infra↩.) The terms of the credit agreement (hereinafter sometimes referred to as Credit Agreement) for this loan include a restriction on distributions of capital by Rubicon.
7. The Agreement Respecting Sale of Shares, which is the basis of this sentence of our findings, is dated "as of the 5th day of January, 1982". However, the parties have presented it as a part of what they have stipulated to as "an Interim Shareholders Agreement made as of December 29, 1981".↩
8. Imperial's guaranty to the two banks was actually made by its American subsidiary, ICI Americas.↩
9. So stipulated. Both sides agree that, on Dec. 27, 1981, Rubicon had $ 6,276,000 cash and short-term investments.↩
10. The record does not explain why the promissory note is dated 3 days before it was transferred to Imperial.↩
11. Secs. 301 and 316 provide, in pertinent part, as follows: SEC. 301. DISTRIBUTIONS OF PROPERTY. (a) In General. -- Except as otherwise provided in this chapter [chapter 1, relating to normal taxes and surtaxes], a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c). * * * (c) Amount Taxable. -- In the case of a distribution to which subsection (a) applies -- (1) Amount constituting dividend. -- That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.
SEC. 316. DIVIDEND DEFINED. (a) General Rule. -- For purposes of this subtitle [subtitle A, relating to income taxes], the term "dividend" means any distribution of property made by a corporation to its shareholders -- * * * To the extent that any distribution is, under any provision of this subchapter [subchapter C, relating to corporate distributions and adjustments], treated as a distribution of property to which section 301↩ applies, such distribution shall be treated as a distribution of property for purposes of this subsection.
12. Sec. 243 provides, in pertinent part, as follows: SEC. 243. DIVIDENDS RECEIVED BY CORPORATIONS. (a) General Rule. -- In the case of a corporation, there shall be allowed as a deduction an amount equal to the following percentages of the amount received as dividends from a domestic corporation which is subject to taxation under this chapter: (1) 85 percent, in the case of dividends other than dividends described in paragraph (2) or (3);↩
[The subsequent amendments of this provision by sec. 611(a)(1) of the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2085, 2249), and by sec. 10221 of the Omnibus Budget Reconciliation Act of 1987 (Pub. L. 100-203, 101 Stat. 1330, 1330-408) do not affect the instant case. Those amendments reduced the deduction to 80 percent (1986 Act) and then to 70 percent (1987 Act).]
13. For the year in issue, the corporate alternative tax rate for long-term capital gains was 28 percent; it is now 34 percent.↩
14. The parties have stipulated as follows: 24. The earnings and profits of Rubicon Chemical as of the close of the taxable year ended December 26, 1982 were sufficient to cover in full the disputed distribution made on December 31, 1981.
We interpret this as meaning that Rubicon's earnings and profits are sufficient to cover all the Dec. 31, 1981, transfers, including those to Imperial. See sec. 1.316-1(a)(3), Income Tax Regs., illustrating that earnings and profits are divided equally between two equal shareholders who received equal dividends. Also, in their tax return, petitioners reported Rubicon's transfer of R2 stock as a $ 276,117 dividend. In the notice of deficiency, respondent determined that this transfer, too, is not a dividend but is part of the sale price of Uniroyal's Rubicon stock. At trial, respondent conceded that the $ 276,117 is properly taxable as a dividend and not as part of the sale price.↩
15. See, e.g., TSN Liquidating Corp., Inc. v. United States, 624 F.2d 1328 (5th Cir. 1980); Waterman Steamship Corp. v. Commissioner, 430 F.2d 1185 (5th Cir. 1970), revg. 50 T.C. 650 (1968); Reitz v. Commissioner, 61 T.C. 443 (1974), affd. without published opinion 507 F.2d 1279 (5th Cir. 1975); Henry Schwartz Corp. v. Commissioner, 60 T.C. 728 (1973); Pacific Coast Music Jobbers, Inc. v. Commissioner, 55 T.C. 866 (1971), affd. 457 F.2d 1165 (5th Cir. 1972); Steel Improvement & Forge Co. v. Commissioner, 36 T.C. 265 (1961), revd. 314 F.2d 96 (6th Cir. 1963); Christensen v. Commissioner, 33 T.C. 500 (1959); Wilson v. Commissioner, 27 T.C. 976 (1957), affd. 255 F.2d 702 (5th Cir. 1958); Miller v. Commissioner, 26 T.C. 151 (1956), revd. 247 F.2d 206 (7th Cir. 1957); Gilmore v. Commissioner, 25 T.C. 1321 (1956); Coffey v. Commissioner, 14 T.C. 1410 (1950); Casner v. Commissioner, T.C. Memo. 1969-98, affd. in part and revd. in part 450 F.2d 379↩ (5th Cir. 1971).
16. The instant case does not present an element that figured in the disposition of Estate of Durkin v. Commissioner↩, 99 T.C. (1992), that is, in the instant case petitioners do not disavow the form that Uniroyal helped to create; rather, they contend that the form used in the transactions correctly reflects the substance of the transactions and should be given its normal tax effect.
17. Also, the Waterman Steamship precedential waters appear to be muddied. The Court of Appeals for the Fifth Circuit has recently suggested that, if it had applied its current standards for review to Waterman Steamship Corp. v. Commissioner, supra, and Casner v. Commissioner, supra, then it might not have reversed our opinions in those cases. In Utley v. Commissioner, 906 F.2d 1033, 1036 n.7 (5th Cir. 1990), affg. in part and remanding in part T.C. Memo. 1988-575, the Court of Appeals stated as follows: Taxpayers argue that we should apply a de novo standard of review. They cite pre-1980 cases which held that "the legal characterization for federal tax purposes of the transactions between the parties . . . is not a question of fact" subject to clearly erroneous review. Casner v. Commissioner, 450 F.2d 379, 387 (5th Cir. 1971); Waterman Steamship Corp. v. Commissioner, 430 F.2d 1185, 1192 (5th Cir. 1970), cert. denied, 401 U.S. 939, 91 S.Ct. 936, 28 L.Ed.2d 219 (1971). However, these decisions were apparently grounded in our "conceptual thicket of ultimate and subsidiary facts" which was levelled by the Supreme Court in Pullman-Standard v. Swint, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), as recognized in the tax context in Byram v. United States, 705 F.2d 1418, 1421-23 (5th Cir. 1983). As Byram explained, Pullman-Standard held that Rule 52(a) "broadly requires" that findings of fact not be set aside unless clearly erroneous even where an "objective inquiry" of multiple factors is made by the tax court. Id.↩ at 1422-23 & n. 9. Whether a transfer was a sale is an inherently factual question; therefore, the clearly erroneous standard of review applies.
18. See secs. 1361 through 1379.↩